USCA1 Opinion

 

[NOT FOR PUBLICATION--NOT TO BE CITED AS PRECEDENT]United States Court of AppealsFor the First Circuit No. 98-1890 LUCY APPLEYARD, Plaintiff, Appellee, v. JOHN W. DOUGLASS, JR., Defendant, Appellant. APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Zachary R. Karol, U.S. Magistrate Judge] Before Torruella, Chief Judge,Bownes, Senior Circuit Judge,and Lynch, Circuit Judge. Philip R. Olenick for appellant. John A. James, Jr. for appellee.March 10, 1999   BOWNES, Senior Circuit Judge. Lucy Appleyard, a citizenof New Hampshire, brought this action to obtain the alleged balancedue of $367,352.29 on a promissory note executed by theJ.W. Douglass Corporation (JWD) and guaranteed by defendantJ.W. Douglass, Jr., a citizen of Massachusetts. This is the secondtime this case is before us. On March 6, 1998, in an unpublishedopinion, we upheld the determination of the district court thatLucy Appleyard had standing to bring suit but remanded for a newdetermination of damages. The case was tried by agreement of theparties before a United States Magistrate Judge. The samemagistrate judge handled the remand. I This opinion is concerned only with the determination ofdamages on remand. We rehearse the relevant facts. AppleyardMotor transported gasoline and other petroleum products. Itsannual revenue approximated $2.5 million. Its sole stockholder wasJohn Appleyard, husband of plaintiff. JWD was also in the truckingbusiness. In addition to gasoline and petroleum products ittransported ready mix concrete and sand and gravel. JWD's annualrevenues were approximately $20 million. Sometime before September 16, 1988, the two corporationsentered into negotiations for the sale of Appleyard Motor'sbusiness and assets to JWD. John Appleyard died on September 16,1988. Negotiations between the two companies continued afterJohn Appleyard's death. On November 23, 1988, Lucy Appleyard, asthe new president of Appleyard Motor, executed a purchase and saleagreement with JWD. Under the agreement Appleyard Motor sold itsbusiness and tangible assets to JWD for $800,000. JWD paid$500,000 cash and gave Appleyard Motor a non-negotiable promissorynote for the balance of $300,000 payable monthly with interest at10%. This broke down to thirty-five monthly payments in the amountof $9,680.16 each. John W. Douglass, Jr., defendant, personallyguaranteed the note. JWD made eleven monthly payments directly toplaintiff for a total of $106,481.76. The purchase and sale agreement contained the followingrepresentation: "[T]o the best of its knowledge and belief,[Appleyard Motor] is in full compliance with all laws andregulations which apply to the conduct of its business, includingall laws and regulations relating to employment." JWD stopped payments on the note as of November, 1989. In January of 1990, JWD filed a chapter 11 bankruptcy petition. OnJanuary 4, 1991, the Massachusetts Secretary of State involuntarilydissolved Appleyard Motor under chapter 156, section 101 of theMassachusetts General Laws. The complaint in this action was filedon January 19, 1995. II In our first opinion we made holdings and rulings on thedamages evidence intended as a guide for the magistrate judge onremand. We start with the finding and ruling of the magistratejudge that are the genesis of the damages issue. The magistratejudge found that "AMT's [Appleyard's] drivers were driving anexcessive number of hours and that AMT must have known this. This constitutes a false representation or breach of warranty." There was unrebutted testimony by Gerald Felise, vicepresident and chief financial officer of JWD, along the followinglines. Felise had extensive experience in the trucking industry. The Department of Transportation has a long-standing requirementmandating that truck drivers keep a record of all hours spent "onduty" and "off duty." The time records must be kept in what iscalled a log. It is the responsibility of the trucking employer tosee to it that the logs are accurate. The logs are required to bekept at the terminal of origin and at the corporate office. Afterhe took over at JWD in 1989, Felise conducted an audit of theAppleyard Motor site in Methuen, Massachusetts. He found thatalthough the logs kept by the truck drivers appeared to be incompliance with Department of Transportation hour requirements,they did not check out with the trip tickets issued at the pointsof origin and delivery. Trip tickets are stamped with the time thetruck leaves the terminal and another ticket shows the time ofdelivery of the load. Unlike the logs, the truckers had no controlover the times stamped on trip tickets. Appleyard Motor had alarge percentage of independent truckers hauling for it. Independent truckers own their own tractors and lease containersfurnished by the trucking company. It is to the financialadvantage of independent truckers to carry as many loads aspossible, which may mean working more hours than allowed by theDepartment of Transportation. Based on Felise's testimony we concluded that the findingand ruling of the magistrate judge were neither clearly erroneousnor legal error insofar as they involved an interpretation ofparagraph 7J of the purchase and sale agreement. This paragraphstated: Seller, to the best of its knowledge and belief, is in full compliance with all laws and regulations which apply to the conduct of its business, including all laws and regulations relating to employment. We next reviewed the relevant part of the magistratejudge's opinion on damages. He found first: Upon discovering that AMT's [Appleyard Motor's] drivers had been driving excessive hours, Gerald Felise, Vice President and Chief Operating officer of JWD [Douglass Corp.], issued a directive to the drivers to bring their hours into compliance with the law. In order to compensate the drivers for the loss of driving time, AMT had to raise the rates it charged its customers. This, in turn, resulted in a loss of customers and a $300,000 annual decline in revenue associated with the former AMT operation. We found no fault with this finding. It was amplysupported by the record.  We held the findings and rulings that followed to beclearly erroneous. The magistrate judge found and ruled: Starting from an annual revenue base of $2.5 million, this amounts to a 12% decline.  Although Douglas [sic] presented no evidence that purported to address directly the issue of damages or even to quantify JWD's loss in profits as a result of this decline in revenue, I infer that, if JWD had known that annual revenue from the AMT operation would decline 12% as a result of JWD having to bring that operation into compliance with law, the fair price JWD would have been willing to pay for AMT would have been at least 12% (or $96,000) below the $800,000 it agreed to pay.  On this basis, I find that the difference between the value of the assets as represented or warranted and their actual value was at least $96,000. Based upon his finding of a 12% (or $96,000) offset, themagistrate judge found that Douglass owed Lucy Appleyard "a totalof $206,270," which included interest. In our remand opinion we concluded that there was noevidentiary basis for the analysis and findings. We noted firstthat the statement by the magistrate judge that "Douglas presentedno evidence that purported to address directly the issue of damagesor even to quantify JWD's loss in profits as a result of thisdecline in revenue" was contrary to the record. Gerard Felise,vice president and chief financial officer of JWD, testifieddirectly on this. His testimony can be summarized as follows. Appleyard Motor's operations at the Methuen,Massachusetts, site grossed $2.5 million annually. Its operatingcost was 87 cents on the dollar; this meant that its profit was 13cents on the dollar. This translated into roughly between $200,000and $400,000 worth of cash flow profits annually. In order tooperate in compliance with the Department of Transportation'shourly requirements the rates charged customers were increased by18%. The customers refused to pay the additional 18%. Thisresulted in a "negative revenue stream" of $300,000, or to put itanother way, there was a $300,000 annualized decline in revenuebased on a $2.5 million starting point. This contributed to anoverall decline in revenue of 40% for JWD. The result was thefiling of a chapter 11 petition in bankruptcy by JWD on January 27,1990. In answer to a question by the magistrate judge, Felisestated that the $300,000 loss in annual revenue was due solely tothe mandatory compliance with the reduced hours required by theDepartment of Transportation. The magistrate judge did notquestion the credibility of Felise; indeed, he relied on histestimony in finding a false representation by Appleyard Motor. There was also testimony by Michael Pierce, accountantfor Appleyard Motor, that prior to the sale of its assets itsprofits were $200,000-$300,000 a year. Thus, it appears from theevidence that the entire profit margin of Appleyard Motor was wipedout when the driving hours violation was corrected. We further held that there was no evidentiary basis forthe magistrate judge's finding that if JWD had known that theannual revenue from the Appleyard Motor operation would decline 12%because customer rates had to be raised 18% to bring the operationinto compliance with the law, "the fair price JWD [Douglass] wouldhave been willing to pay for AMT [Appleyard] would have been atleast 12% (or $96,000) below the $800,000 it agreed to pay." We pointed out that there was no testimony as to what awilling seller would have paid a willing buyer under thesecircumstances. We then stated: Moreover, the magistrate judge gave no consideration to the inescapable fact that a reduction of $300,000.00 in annual earnings effectively eliminated Appleyard Motor's profits. We cannot conjecture without evidence what Douglass Corp. would have paid if the hour violations had been brought to its attention prior to the sale. Douglass may well have decided not to purchase Appleyard Motor. We further held that it was clearly established that the "hours violation resulted directly in an annual loss of revenue toDouglass Corp. of $300,000," and that this violated the offsetprovision in the note and purchase and sale agreement. The offsetagreement is no longer a factor in the case, however, becausedefendant has expressly waived any sums due under the offsetprovision. All he seeks is a ruling that he is not liable for anyfurther payments on the note. Footnote 1, First Opinion. At the conclusion of our first opinion we reiterated:  The district court clearly erred when it inferred that Douglass Corp. would have paid only 12% less for Appleyard Motor in the total absence of any evidence to that effect. This is especially so in light of the fact that bringing Appleyard Motor into compliance with Department of Transportation requirements obliterated the profit margin of the purchased entity. III On remand the magistrate judge concluded  that the evidence in the trial record is insufficient to enable a rational factfinder to determine with a reasonable degree of certainty what damages defendant suffered as a result of plaintiff's misrepresentation or breach of warranty. Therefore, I have decided to reopen the record to permit defendant to present additional evidence on the subject. Defendant declined to present any further evidence on theground that under the law of the case doctrine, the magistratejudge had a duty to follow our rulings and findings and decide thecase on the evidence already addressed. The magistrate judge thenordered the clerk to enter judgment in favor of plaintiff, Lucy Appleyard, in the amount of $369,288, being the amount of principal, interest, and late charges to which plaintiff proved she was entitled, before any offset for damages suffered by JWD as a result of the misrepresentation of breach of warranty by plaintiff's predecessor.This was $163,018 more than the first judgment. This appealfollowed. The magistrate judge agreed with us that there was noevidence of what a willing buyer would have paid a willing sellerif the buyer had known that the truck driver's records had beenmisrepresented to the extent of causing a reduction in Appleyard'searnings of $300,000. Quite inexplicably the magistrate judge thendiscusses at length how he arrived at the 12% ($96,000) discountedvalue.  The magistrate judge rejected our ruling that he haderred in stating that defendant had "presented no evidence thatpurported to address directly the issue of damages or even toquantify JWD's loss in profits as a result of the decline inreview." We pointed out that Gerard Felise, vice president andchief financial officer of JWD, testified directly on this. Wealso summarized Felise's testimony. The magistrate judge mounts a complex seven-page argumentinvolving fixed and variable costs rejecting the testimony ofFelise. He concludes this part of his opinion by stating, "itcannot be said with reasonable certainty what happened to AMT'sprofits as rates increased and rates declined."  We stated in our first opinion: "Moreover, themagistrate judge gave no consideration to the inescapable fact thata reduction of $300,000 in annual earnings effectively eliminatedAppleyard Motor's profits." We think this clearly was binding onthe magistrate judge under the "law of the case" doctrine. Themagistrate judge thought otherwise: This brings me back to the very troubling "law of the case" issue and to my reasons for rejecting defendant's argument that the First Circuit's decision mandates a finding that the $300,000 decline in revenues produced by the 18% rate increase in fact wiped out AMT's profits. IV We next consider "the law of the case" doctrine as itapplies to this case. We recently held that "[f]or a bar to exist,an issue must have been 'actually considered and decided by theappellate court' or . . . be 'necessarily inferred from thedisposition on appeal.'" Field v. Mans, 157 F.3d 35, 40 (1st Cir.1998); see also Commercial Union Ins. Co. v. Walbrook Ins. Co., 41F.3d 764, 770 (1st Cir. 1994). While a future court is not boundby non-essential dicta, it "must implement both the letter andspirit of the mandate, taking into account the appellate court'sopinion and the circumstances it embraces." United States v.Connell, 6 F.3d 27, 30 (1st Cir. 1993). Our conclusion in ourfirst opinion that Appleyard Motor's profits were "effectivelyeliminated" was based on the testimony of Gerard Felise, vicepresident and chief financial officer of JWD and the testimony ofthe accountant for Appleyard that prior to its sale to JWD,Appleyard Motor's profits were $200,000-$300,000 a year. Themagistrate judge did not question the credibility of either ofthese witnesses. The law of the case established that all profitswere eliminated. Given the law of the case, the undisputed evidence, andthe conclusion that the value of the business was the sum of itsequipment value and goodwill, we disagree with the magistrate'sdetermination that there was insufficient evidence to decide thecase. It follows that we disagree with the magistrate judge'sruling that the record was "insufficient to enable a rationalfactfinder to determine with a reasonable degree of certainty whatdamages defendant suffered as a result of plaintiff'smisrepresentation or breach of warranty." Moreover, after readingthe magistrate judge's opinion carefully, we have difficultyunderstanding how defendant could have proven to the magistratejudge's satisfaction that JWD had suffered any damages by reason ofthe false representation. We, therefore, rule that it was error for the magistratejudge to, in effect, penalize defendant for not producingadditional evidence. This means that we reject plaintiff's argument thatdefendant waived his right to proceed on the merits when he electednot to provide additional evidence after he was invited to do so. The magistrate judge did not in fact rule that defendant had waivedhis claim. After summarizing the reasons why he could not decidethe damages without additional evidence, he stated: Accordingly, for the reasons stated in the Decision on Remand, and in light of defendant's decision not to present additional evidence regarding damages, the clerk is hereby ORDERED to enter judgment in favor of plaintiff, Lucy Appleyard, in the amount of $369,288, being the amount of principal, interest, and late charges to which plaintiff proved she was entitled, before any offset for damages suffered by JWD as a result of the misrepresentation or breach of warranty by plaintiff's predecessor. Because of the magistrate judge's refusal to follow ourclear holdings and rulings, we rule that defendant had the right toappeal the judgment of the magistrate judge and proceed on therecord before the court. The final issue is: in light of our rulings and findingson the applicability of the "law of the case" doctrine, how shouldwe proceed. We are reluctant to remand the case again to anotherjudge for another determination of damages. There are certaincircumstances where remand can be dispensed with, such as where therecord permits only one rational answer or where repeated effortsat factfinding have resulted in confused or unsupportable findings. See, e.g., Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 72 F.3d190, 198 (1st Cir. 1995) (in lieu of remand, sorting through recordto distinguish findings as to which deference is due and taintedfindings as to which deference is not owed); Williams v. Poulos, 11F.3d 271, 280 (1st Cir. 1993) (describing conditions under which"court of appeals [itself] can, and often should," fix an error). This is such a situation. There is evidence in the recordsufficiently clear and uncontested to allow us to make thenecessary findings to terminate the case at the appellate level. The following facts are uncontroverted. Appleyard Motorand JWD executed a purchase and sale agreement on November 23,1988. Under its terms JWD purchased the business and tangibleassets of Appleyard for $800,000. Five hundred thousand dollars ofthe purchase price was paid in cash. The balance of $300,000 wasto be made in thirty-five monthly payments. A total of $106,481.76was paid on the note. JWD had paid a total of $606,481.76 toAppleyard before it stopped payments on the note as of November1989. In January of 1990 JWD filed a chapter 11 bankruptcypetition. The magistrate judge found in his first opinion, basedupon the testimony of Gerard Felise, that the false representation "resulted in a loss of customers and a $300,000 annual decline inrevenue associated with the former AMT operation." See infra at 5. This finding was clearly correct. The evidence is that Felise tookover the operation of both companies in 1989.  We make the following rulings: Because of the raise inrates put into effect by Felise, JWD received $300,000 less inrevenue from its Appleyard operation. This was due to the factthat when the rates were raised in 1989 to meet federal work-hourrequirements, Appleyard lost customers. Appleyard's annual profitshad ranged between $200,000 to $300,000 a year. After the rateshad been raised but rejected by its customer, Appleyard could nolonger operate at a profit. After JWD filed for bankruptcy inJanuary of 1990, Appleyard also ceased to exist as an operatingbusiness. The false representation by Appleyard caused the demiseof both businesses. Based on these undisputed facts, we conclude thatdefendant has no obligation to make any further payments toplaintiff. Defendant has expressly waived any sums that might bedue under the offset provision of the purchase and sale agreement. This means, of course, that he cannot attempt to collect any moneythat might theoretically be due from plaintiff either individually or as a former officer of Appleyard Motors. The judgment below is reversed and remanded withdirections to the district court to enter judgment in favor ofdefendant, John W. Douglass, Jr. No costs to either party on appeal.