Filed: June 29, 1999

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 98-2548
(CA-98-774-A, BK-97-1226)

Foley & Lardner,

Plaintiff - Appellee,

versus

Salvatore D. Biondo, et al,

Defendants - Appellants.

O R D E R

The court amends its opinion filed June 8, 1999, as follows:

On page 6, first full paragraph -- the paragraph is rewritten to read as follows:

Section 523(a)(2)(A) covers debts incurred through the direct provision of "money, property, [or] services." In short, the primary debtor-creditor relationship is covered by § 523(a)(2)(A) through express language extending its scope to debts incurred through the direct acquisition of value. See 11 U.S.C.A. § 523(a)(2)(A). Section 523(a)(2)(A), however, also reaches secondary debt transactions -- extensions, renewals, and refinancings. See § 523(a)(2)(A) (extending the exception to discharge provision to debt for "an extension, renewal or refinancing of credit"); Codisco, Inc. v. Marx (In re Marx), 138 B.R. 633, 636 (Bankr. M.D.

Fla. 1992) (holding that the terms "<u>renewal</u> or <u>re-financing</u> of credit ... necessarily contemplate the prior granting of credit to the debtor and arrangements to continue the credit"). Therefore, we believe that the disjunctive clauses in § 523(a)(2) cover two distinct scenarios.

(The placement and text of footnote 1 remain the same.)

On page 6, second full paragraph, line 1 -- the paragraph is corrected to begin: "<u>We realize that</u> some courts ...."

For the Court - By Direction


/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

In Re: SALVATORE D. BIONDO; SUSAN
J. BIONDO,
<u>Debtors.</u>

FOLEY & LARDNER,

No. 98-2548

<u>Plaintiff-Appellee,</u>

v.

SALVATORE D. BIONDO; SUSAN J.
BIONDO,
<u>Defendants-Appellants.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-98-774-A, BK-97-1226)

Argued: April 7, 1999

Decided: June 8, 1999

Before WILKINSON, Chief Judge, and HAMILTON and
WILLIAMS, Circuit Judges.

_____

Affirmed by published opinion. Judge Williams wrote the opinion, in
which Chief Judge Wilkinson and Judge Hamilton joined.

_____

**COUNSEL**

**ARGUED:** Steven Bret Ramsdell, TYLER, BARTL, BURKE &
ALBERT, P.L.C., Alexandria, Virginia, for Appellants. Joseph

Dowell Edmondson, Jr., FOLEY & LARDNER, Washington, D.C., for Appellee.

_____

**OPINION**

WILLIAMS, Circuit Judge:

Salvatore and Susan Biondo (the Biondos) filed a joint voluntary petition under Chapter 7 of the Bankruptcy Code on March 20, 1997. On June 30, 1997, Foley & Lardner filed a complaint in the bankruptcy court seeking a determination that its $175,663 claim for legal fees and costs against the Biondos was not dischargeable. Foley & Lardner lodged several objections under the discharge provisions of 11 U.S.C.A. § 727 (West 1993), and alleged that the claim was excepted from discharge under 11 U.S.C.A. § 523 (West 1993 & Supp. 1999), which excludes certain debts from discharge if they were initiated through false representation, false pretenses, or actual fraud. See 11 U.S.C.A. § 523(a)(2)(A) (West 1993). On April 28, 1998, the bankruptcy court entered final judgment in favor of Foley & Lardner, holding that its claim was excepted from discharge under 11 U.S.C.A. § 523(a)(2)(A), and on appeal, the district court affirmed the bankruptcy court's decision. The Biondos now appeal to this Court. We also affirm.

I.

In the early 1990s, the Biondos employed the law firm of Foley & Lardner to represent their interests in litigation over a real estate partnership. According to the partner in charge of Foley & Lardner's Washington, D.C. office, the Biondos' legal bill grew to over $100,000, with the Biondos having paid only about $5,000 during the course of the representation. Because Foley & Lardner was unable to collect the amount due, it withdrew from its representation of the Biondos after receiving permission from the court.

Initially, the parties attempted to reach a suitable repayment agreement, but they could not reach a consensus. To recover the outstanding fees, Foley & Lardner filed essentially identical claims against the

Biondos in both the Circuit Court of Fairfax County, Virginia, and the Circuit Court of Montgomery County, Maryland, in September of 1993.

While the suits were pending, and unbeknownst to Foley & Lardner, the Biondos executed what the bankruptcy court aptly described as an "elaborate" and "Byzantine collection of documents, referred to as an estate plan." (J.A. at 173.) These estate planning instruments created a limited partnership named B.E.F. L.P., of which both Susan and Salvatore Biondo were general partners. The Biondos and two other family members were limited partners. As a part of the overall estate plan, the Biondos' interests in two real estate partnerships, Market Square Partnership, Ltd. and Tectonics Southern Partnership, Ltd. (the Partnerships), were transferred to B.E.F. L.P. To transfer their interests in the Partnerships to B.E.F. L.P., both Susan and Salvatore Biondo signed a "Bill of Sale and/or Assignment" for each of the Partnerships. The documents were signed and the interests in the Partnerships were transferred on January 18, 1994.

During the same time frame, the Biondos again entered into negotiations with Foley & Lardner. On March 18, 1994, the parties reached an agreement to settle the outstanding debt. The terms of the signed Settlement Agreement required Foley & Lardner to take a voluntary nonsuit in the previously filed actions, temporarily to forbear any collection actions, and to accept $54,671 plus eight percent annual interest in full payment for the legal services, rather than the total amount outstanding of $130,749. In return, the Biondos agreed to pay the reduced amount by December 31, 1995, and assigned to Foley & Lardner all distributions from the Partnerships. In connection with the Settlement Agreement, the Biondos entered into an Assignment and Security Agreement (the Security Agreement) and provided Foley & Lardner with a Promissory Note (the Note). The Note detailed the agreed upon payment terms and contained a confession-of-judgment clause in case of default.

The Security Agreement established Foley & Lardner's interest in the Partnerships through an assignment of all the Biondos' rights to distributions. The assignment of interest in the Partnerships was expressly stated to be a "material inducement to [Foley & Lardner] to enter into the transactions contemplated by the Settlement Agree-

3

ment." (J.A. at 398.) The Security Agreement represented that the Biondos "possesse[d] all requisite power and authority to enter into and perform . . . obligations under the Settlement Agreement and this Assignment and to carry out the transactions contemplated hereby and thereby," and that no consents, authorizations, or approvals were necessary from any outside parties. (J.A. at 399.) The Security Agreement also stated that the Biondos were then and would be "the sole, lawful, legal and beneficial owner[s]" of the interest in the collateral, i.e., the Partnerships. (J.A. at 399.) Finally, the Security Agreement pledged that "[a]ll information furnished by the [Biondos] concerning the Collateral is and shall remain true, correct and complete in all material respects." (J.A. at 400.)

The Biondos failed to pay the $54,671 to Foley & Lardner by December 31, 1995. In accordance with the confession-of-judgment rights contained in the Note, Foley & Lardner obtained judgment against the Biondos in the amount of $175,663, consisting of the fees for legal services, accrued interest, and attorneys' fees related to the debt collection. The judgment was obtained on February 26, 1996. On March 20, 1997, the Biondos filed for bankruptcy, leading to Foley & Lardner's claim against the bankruptcy estate and this action.

Both the bankruptcy court and the district court held that the Biondos' debt to Foley & Lardner was excepted from discharge under 11 U.S.C.A. § 523(a)(2)(A) (West 1993). Specifically, the bankruptcy court found that the Biondos knowingly and falsely represented that they maintained and could transfer interests in the Partnerships when, in fact, those interests already had been placed into the B.E.F. L.P. For the reasons that follow, we find no error in this holding and therefore affirm the judgment.

II.

"We review the judgment of a district court sitting in review of a bankruptcy court de novo, applying the same standards of review that were applied in the district court." Three Sisters Partners, L.L.C. v. Harden (In re Shangra-La, Inc.), 167 F.3d 843, 847 (4th Cir. 1999). Specifically, "[w]e review the bankruptcy court's factual findings for clear error, while we review questions of law de novo." Loudoun Leasing Dev. Co. v. Ford Motor Credit Co. (In re K&L Lakeland,

4

Inc.), 128 F.3d 203, 206 (4th Cir. 1997). When addressing exceptions to discharge, we traditionally interpret the exceptions narrowly to protect the purpose of providing debtors a fresh start. See, e.g., Century 21 Balfour Real Estate v. Menna (In re Menna), 16 F.3d 7, 9 (1st Cir. 1994). We are equally concerned with ensuring that perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code. See Cohen v. Cruz, 118 S. Ct. 1212, 1216 (1998). The parties to this case present competing theories; the Biondos press the importance of a fresh start, while Foley & Lardner claims that it is a victim of fraud. We turn to the governing statutes.

The lower courts determined that the Biondos' debt to Foley & Lardner was excepted from discharge under 11 U.S.C.A.

§ 523(a)(2)(A) (West 1993). Section 523 reads:

> A discharge under section 727 . . . does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . .. .

11 U.S.C.A. § 523(a)(2)(A). The Biondos first contend that the Settlement Agreement, Note, and Security Agreement, did not constitute an "extension, renewal, or refinancing of credit," thus removing any actions concerning those agreements from the purview of § 523(a)(2). Second, they argue that the legal services were not "obtained by" false pretenses, false representation, or actual fraud. Third, the Biondos claim that their conduct did not amount to "false pretenses, a false representation, or actual fraud." We address these contentions seriatim.

A.

Through explicit language, Congress provided not only that debts incurred through the direct provision of money, property, or services, but also that the extension, renewal, or refinancing of credit, would fall under the purview of Bankruptcy Code § 523(a)(2)(A). See 11 U.S.C.A. § 523(a)(2)(A). There is no argument that the original debt was incurred through the provision of legal services. The question the

5

Biondos present is whether the Settlement Agreement and the ancillary agreements were extensions, renewals, or refinancings of credit. This inquiry requires that we define the boundaries of extending, renewing, and refinancing, credit. The Bankruptcy Code does not guide us to a unique interpretation of these terms; therefore, we will turn to their common understanding. See Union Pac. R.R. Co. v. Hall, 91 U.S. 343, 347 (1875) ("Congress may well be supposed to have used language in accordance with the common understanding."); see also, e.g., Fischer v. Scarborough (In re Scarborough) 171 F.3d 638, 643 (8th Cir. 1999) (employing dictionary definitions to interpret the terms of § 523); Field v. Mans, 157 F.3d 35, 43 (1st Cir. 1998) (same); Lewis v. Scott (In re Lewis), 97 F.3d. 1182, 1186 (9th Cir. 1996) (same).

Section 523(a)(2)(A) covers debts incurred through the direct provision of "money, property, [or] services."[1] In short, the primary debtor-creditor relationship is covered by § 523(a)(2)(A) through express language extending its scope to debts incurred through the direct acquisition of value. See 11 U.S.C.A. § 523(a)(2)(A). Section 523(a)(2)(A), however, also reaches secondary debt transactions -- extensions, renewals, and refinancings. See § 523(a)(2)(A) (extending the exception to discharge provision to debt for "an extension, renewal or refinancing of credit"); Codisco, Inc. v. Marx (In re Marx), 138 B.R. 633, 636 (Bankr. M.D. Fla. 1992) (holding that the terms "renewal or refinancing of credit ... necessarily contemplate the prior granting of credit to the debtor and arrangements to continue the credit"). Therefore, we believe that the disjunctive clauses in § 523(a)(2) cover two distinct scenarios.

We realize that some courts have held that the definition of "extension" also

_____

[1] Not every commercial transaction results in a debtor-creditor relationship, as exemplified by the immediate, and theoretically simultaneous, exchange of cash for goods. See, e.g., Bass v. Stolper, Koritzinksy, Brewster & Neider, S.C., 111 F.3d 1322, 1332 n.4 (7th Cir. 1997) (Bauer, J., dissenting) ("The relationship of seller-buyer is much different from creditor-debtor."). Often, however, the purchaser may, instead of tendering cash, create a separate debtor-creditor relationship with the seller. See Official Comm. of Unsecured Creditors v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.), 997 F.2d 1039, 1060 (3d Cir. 1993) ("Typically, . . . debtor-creditor relationships are created by contractual agreement between two parties.").

includes an original credit arrangement. See Field, 157 F.3d at 43 (holding that the original entry into the debtor-creditor relationship, as well as the continuation of an established debtor-creditor relationship constituted an "extension" of credit); see also William D. Hawkland & Lary Lawrence, Uniform Commercial Code Series § 3-302:09 (1984) ("A financed sale is, generally, any extension of credit by the seller to the consumer to purchase the goods.").[2] Although we find this alternate interpretation accurate, we focus on the definitional aspect of "extension" that is distinguishable from what Congress earlier provided in § 523(a)(2) -- the clause embracing debts for the provision of money, property, and services. Our definition focuses on an "extension" of credit as an autonomous transaction that results in the lengthening of a debtor-creditor relationship. Black's Law Dictionary defines extension as "[a]n allowance of additional time for the payment of debts." Black's Law Dictionary 583 (6th ed. 1990). In other words, despite the fact that a debt may already be due, the creditor grants a reprieve to the debtor. See John Deere Co. v. Gerlach (In re Gerlach), 897 F.2d 1048, 1050 (10th Cir. 1990) ("An extension, within the meaning of § 523(a)(2), is an indulgence by a creditor giving his debtor further time to pay an existing debt." (internal quotation marks omitted)). An extension of credit is analogous to the classic forbearance[3] granted by a creditor in relation to a matured debt. Extensions of credit under § 523(a)(2) are thus properly viewed as merely an agreed enlargement of the time allowed for payment.

Renewal and refinancing are similar terms that also concern secondary debt transactions, but define somewhat different activities. A renewal also extends the debt, but through a re-establishment of the debtor-creditor relationship, even if the renewal is contemplated, but

_____

[2] We also recognize that the First Circuit interpreted an "extension of credit" to encompass a creditor's later inaction regarding its right to accelerate a debt and thereby end the debtor-creditor relationship. See Field v. Mans, 157 F.3d 35, 43 (1st Cir. 1998). Because it is unnecessary to this case, we will put off determining whether, in a given circumstance, complete inaction by the creditor can be termed an "extension of credit."

[3] "Forbearance" is defined as "[g]iving of further time for repayment of obligation or agreement not to enforce claim at its due date." Black's Law Dictionary 644 (6th ed. 1990).

7

not certain, under the original credit agreement. **4** <u>See Norris v. First Nat'l Bank</u> (<u>In re Norris</u>), 70 F.3d 27, 29-30 (5th Cir. 1995) (holding that a required annual approval of a secured note, before extending the due date for an additional year, fell under the renewal provision of § 523(a)(2)); <u>cf. Shawmut Bank, N.A. v. Goodrich</u> (<u>In re Goodrich</u>), 999 F.2d 22, 23 (1st Cir. 1993) (noting the annual "renewal" of a line of credit as falling under § 523(a)(2)); <u>Forbes v. Four Queens Enters., Inc.</u>, 210 B.R. 905, 913 (D.R.I. 1997) (distinguishing a renewal of credit from a grant of new credit from the same lender). The hallmark of credit "renewal" is therefore the re-establishment of a pre-existing debtor-creditor relationship employing similar, if not identical, terms.

Refinancing, however, is such a significant change in circumstances that it results in the substitution of one debt for another.**5** <u>See In re McFarland</u>, 84 F.3d 943, 947 (7th Cir. 1996) (holding that incurring new debt to retire a previously existing debt is "refinancing" under § 523(a)(2)); <u>Dominion Bank v. Nuckolls</u>, 780 F.2d 408, 413 (4th Cir. 1985) (distinguishing a loan to "refinance a pre-existing debt

_____

**4** <u>Black's Law Dictionary</u> defines "renewal" as follows:

> The act of renewing or reviving. A revival or rehabilitation of an expiring subject; that which is made anew or re-established. The substitution of a new right or obligation for another of the same nature. A change of something old to something new. To grant or obtain extension of; to continue in force for a fresh period, as commonly used with reference to notes and bonds importing a postponement of maturity of obligations dealt with. An extension of time in which that obligation may be discharged; an obligation being "renewed" when the same obligation is carried forward by the new paper or undertaking, whatever it may be.

<u>Black's Law Dictionary</u> 1296-97 (6th ed. 1990).

**5** <u>Black's Law Dictionary</u> defines "refinance" as follows:

> To finance again or anew; to pay off existing debts with funds secured from new debt; to extend the maturity date and/or increase the amount of an existing debt; to arrange for a new payment schedule. The discharge of an obligation with funds acquired through the creation of a new debt, often at a different interest rate.

<u>Black's Law Dictionary</u> 1281 (6th ed. 1990).

8

. . . by paying off the old loan [from] extending a new one" (internal quotation marks omitted)). An actual exchange of money is, of course, a mere formality if the obligation remains with the same creditor. The dispositive characteristic is instead whether the terms of the debt are so substantively different as to constitute a new obligation, which, at least in part, extinguishes a preexisting debt.

The terms collectively used in § 523(a)(2) are thus broad enough to account for virtually every type of secondary debt transaction. Nevertheless, the Biondos argue that Foley & Lardner, by merely agreeing to forbear collection of the debt owed, did not enter into an extension, renewal or refinancing of credit under §523(a)(2). As an initial matter, like the lower courts, we reject the proposition that an agreement to forbear debt collection would fall outside of the auspices of § 523(a)(2). Such a forbearance agreement extends the debtor-creditor relationship beyond the period originally contemplated and can appropriately be labeled a credit extension. The Biondos admit as much by noting that "[a]t most, the settlement agreement provided an <u>extension</u> of time to pay the debt that was already due for legal services." (Appellants' Br. at 11 (emphasis added).) Therefore, even if we accepted the Biondos' argument that the Settlement Agreement constituted a forbearance, that circumstance would very likely constitute an extension under § 523(a)(2).

But, the Settlement Agreement, Security Agreement, and Note did more than simply allow the Biondos to pay at a later date. The terms of the Settlement Agreement also temporarily reduced the amount due, added interest, and assigned Foley & Lardner an interest in any income or distribution from the Partnerships. It also required Foley & Lardner voluntarily to dismiss the suits that were pending against the Biondos and contained a confession-of-judgment clause that would obviate any later litigation that might otherwise be necessary to obtain a judgment against the Biondos. Instead of owing the original $130,749 sum, the Biondos were obligated to pay only $54,671 plus accrued interest by a date certain. Following that date, various contingencies would become operative and would substantially increase the debt. The Settlement Agreement effectively substituted a new debt obligation for the previously existing debt and thus satisfied the definition of a refinancing of credit. Accordingly, we agree with the lower

9

courts that the Settlement Agreement is a separate, identifiable refinancing transaction covered under § 523(a)(2).

B.

Having affirmed that the Settlement Agreement falls under the purview of § 523(a)(2), the Biondos' next argument need not detain us long. The Biondos essentially argue that the original debt to Foley & Lardner is dischargeable because it was incurred through the provision of legal services, which were not "obtained by" any actions alleged to be fraudulent. Although Foley & Lardner does not take issue with this contention, their complaint relates not to the establishment of the original debt, but the Settlement Agreement, or as we have now determined, the refinancing. Therefore, we will now turn to the question of whether the Biondos engaged in fraudulent activity and thereby "obtained" the refinancing.

C.

The Biondos contend that even if § 523(a)(2)(A) does extend to the Settlement Agreement, their conduct did not constitute false pretenses, a false representation, or actual fraud under § 523(a)(2)(A). The lower courts held that the Biondos fraudulently misrepresented their ownership interest and ability to assign the proceeds from the Partnerships in the Settlement Agreement and Security Agreement. To prevail on their assertion that the debt was subject to exception from discharge under § 523(a)(2)(A), Foley & Lardner was required to prove by a preponderance of the evidence that the Biondos did engage in such misconduct. See Grogan v. Garner, 498 U.S. 279, 291 (1991).

In Field v. Mans, 516 U.S. 59 (1995), the Supreme Court established that the terms within § 523(a)(2)(A) should be interpreted according to the common understanding of those terms at the time the statute was enacted. See id. at 70. To define actual fraud, the Supreme Court looked to the definition of fraudulent misrepresentation under the Restatement (Second) of Torts (1976). Because Foley & Lardner alleges similar malfeasance, we will follow the Supreme Court's lead and look to the Restatement to determine the elements required to

10

prove that claim. The <u>Restatement</u> defines the tort of fraudulent misrepresentation as:

> One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

<u>Restatement (Second) of Torts</u> § 525 (1976). Thus, a plaintiff must prove four elements: (1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiff's justifiable reliance on the misrepresentation. It is against this standard that the Biondos' arguments must be addressed.

The Biondos first contend that if there was any misrepresentation, it was innocent, because they believed that the Partnership interests could be assigned to Foley & Lardner. The Biondos' state of mind is a question of fact to be determined in the first instance by the bankruptcy court that can be overturned on appeal only if the finding is clearly erroneous. <u>See Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.)</u>, 914 F.2d 458, 467 (4th Cir. 1990).

In this case the Biondos testified in court that they believed that the Partnership interests could be assigned to Foley & Lardner. They supported their testimony with evidence that in late 1996 they sent a list of debts to Foley & Lardner with the notation that the Foley & Lardner debt was to be serviced with any income from the Partnerships and the uncontested fact that they received the Partnerships' K-1 tax forms personally. The bankruptcy court was obligated to balance that testimony against the fact that the Biondos both signed a "Bill of Sale and/or Assignment of Limited Partnership Interest" granting each of their interests in the Partnerships to the B.E.F. L.P. only two months before they entered into the Settlement Agreement and Security Agreement. After reviewing the evidence, the bankruptcy court stated that it found Susan Biondo's testimony "wholly unbelievable." (J.A. at 185.) The bankruptcy court continued, "I don't believe anyone could sign that massed [sic] papers without understanding what they were doing; and given the proximity in time of having executed those

11

papers, signing the settlement agreement with Foley & Lardner, I cannot find that the debtors would have forgotten what they had done or that they thought it had no legal effect." (J.A. at 185.) The record reveals no reason to believe this finding was clearly erroneous, especially considering the bankruptcy court's unique ability to judge the credibility of the witnesses.

The Biondos next assert that they did not intend to deceive Foley & Lardner, which is akin to arguing that they did not intend to induce Foley & Lardner to act, the second required element of fraudulent misrepresentation. To support their argument, the Biondos state that all they received in return for the representation concerning the Partnerships was a period of forbearance and that it was to their great advantage to comply with the new terms. The reality is, of course, that the Biondos avoided two pending lawsuits, obtained a year and one-half to pay a large debt, and received an opportunity to pay a substantially discounted amount to settle the entire debt. Without the ability to assign the proceeds from the Partnerships, the outcome was much less clear, as demonstrated by a recitation in the Security Agreement noting that the assignment of the proceeds from the Partnerships were a "material inducement" for Foley & Lardner to enter into the Settlement Agreement. (J.A. at 398.) Having already decided that the Biondos knew the representation was false, we can find no other reason for making the representation except to induce Foley & Lardner to enter into the Settlement Agreement.

The third element, causation, is also satisfied. The Biondos argue that the misrepresentation did not proximately cause any damage because they could not have satisfied the debt regardless of the misrepresentation, and, therefore, Foley & Lardner lost nothing. We disagree. It is axiomatic that in the context of a claim for exception to discharge under § 523(a)(2)(A), the harm or damage is the provision of credit. Cf. Wolf v. Campbell (In re Campbell), 159 F.3d 963, 966-67 (6th Cir. 1998) (interpreting "to the extent obtained by" in § 523(a)(2) to require only a showing that the debtor acquired credit and no further proof of damage to the creditor). In this case as in others, the extension, renewal, or refinancing of credit, by its nature, enhances the creditor's risk either by originally extending credit to the debtor or by foregoing an immediate attempt to collect the outstanding debt by renewing or refinancing the debt. In this case, Foley &

12

Lardner voluntarily withdrew its suits for collection and extended the due date for well over a year, exposing itself to the risk that the Biondos' financial circumstances would decline further. Having established that Foley & Lardner did suffer the precise harm that § 523(a)(2)(A) was established to prevent-- the credit risk -- we have little trouble determining that the Biondos' misrepresentations were a root cause. As we noted earlier, the Security Agreement expressly stated that the assignment of the proceeds and distributions from the Partnerships was a material inducement to enter into the Settlement Agreement. The causation hardly could be clearer -- the fraudulent misrepresentation expressly induced the refinancing.

As to the fourth and final element, the Biondos argue that Foley & Lardner did not justifiably rely on the misrepresentation because they were a sophisticated entity and could have at least checked the Partnerships' financial statements. This argument has been expressly rejected by the Supreme Court. In Field, the Supreme Court emphasized the minimal threshold presented by justifiable reliance:

> [T]he illustration is given of a seller of land who says it is free of encumbrances; according to the Restatement, a buyer's reliance on this factual representation is justifiable, even if he could have "walk[ed] across the street to the office of the register of deeds in the courthouse" and easily have learned of an unsatisfied mortgage.

Field, 516 U.S. at 70 (quoting Restatement (Second) of Torts § 540 (1976)). Using this minimal standard, it is clear that Foley & Lardner was not required to inspect the Partnerships' financial statements and was instead justified in relying upon the Biondos' representations that they owned the interests in the Partnerships and could assign them.

We affirm the lower courts' determination that the elements of actual fraud were met in this case.

III.

Because 11 U.S.C.A. § 523(a)(2)(A) (West 1993) encompasses the Settlement Agreement as a refinancing of credit, and the Biondos

13

obtained the refinancing through actual fraud when they misrepresented their ability to assign certain interests in the Partnerships, we hold that the debt is excepted from discharge.

AFFIRMED

14