Case reversed and remanded by
Supreme Court opinion filed 3/31/03

Cert granted by Supreme Court
order filed 6/24/02

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

In Re: LEONARD L. WARNER and
ARLENE L. WARNER,
*Debtors.*

A. ELLIOTT ARCHER; CAROL A.
ARCHER,
    *Plaintiffs-Appellants,*        No. 00-2525

    v.

ARLENE L. WARNER,
    *Defendant-Appellee,*

    and

LEONARD L. WARNER
    *Defendant.*

Appeal from the United States District Court
for the Middle District of North Carolina, at Greensboro.
Frank W. Bullock, Jr., District Judge.
(CA-99-924, BK-96-10373, AP-A-97-2003)

Argued: September 27, 2001

Decided: March 8, 2002

Before WIDENER, NIEMEYER, and TRAXLER, Circuit Judges.

———

Affirmed by published opinion. Judge Widener wrote the majority
opinion, in which Judge Niemeyer joined. Judge Traxler wrote a dis-
senting opinion.

———

## COUNSEL

**ARGUED:** Harry Glen Gordon, GORDON LAW OFFICES, Greensboro, North Carolina, for Appellants. Rayford Kennedy Adams, III, TURNER, ENOCHS & LLOYD, P.A., Greensboro, North Carolina, for Appellee. **ON BRIEF:** Chad A. Sharkey, TURNER, ENOCHS & LLOYD, P.A., Greensboro, North Carolina, for Appellee.

———

## OPINION

WIDENER, Circuit Judge:

Elliot and Carol Archer appeal from the district court's order affirming the bankruptcy court. The district court held that Arlene Warner's affirmative defense of settlement in a state suit, involving the same facts upon which rest the non-dischargeability claim at issue here, created a novation substituting a contract debt which was dischargeable for the tort claims which arguably were not. For the following reasons, we affirm.

### I.

On May 22, 1992, Warner Manufacturing, Inc. and Leonard L. and Arlene Warner, his wife, the owners thereof, sold the corporate assets of Warner Manufacturing to a corporation formed by the Archers for a total of $685,000.[1] In late 1992, the Archers filed suit in Superior Court of Guilford County, North Carolina against Leonard Warner and Warner Manufacturing for fraudulent misrepresentation and like misconduct arising out of the sale. An amended complaint, filed in the state court in March 1994, asserted fraud, misrepresentation, conspiracy, and fraudulent conveyance, among other claims, and added Arlene Warner and two other parties as named defendants. On May 8, 1995, the Archers again amended their complaint to include intentional and negligent infliction of emotional distress, and asserted that

———

[1] The assets of Warner Manufacturing sold for $610,000; there was included in the transaction a $70,000 consulting fee to Leonard Warner and a $5000 non-competition agreement.

2

they had suffered mental and emotional distress, pain and suffering, and loss of enjoyment of life as a consequence of the Warners' alleged acts. Three days later, on May 11, after extensive pre-trial discovery, the parties settled the state court litigation.

The settlement consisted of an agreement, an addendum to the agreement, two releases, a promissory note, and two deeds of trust. The settlement agreement provided that the Archers would receive $300,000, consisting of a $200,000 cash payment which was paid, and a $100,000 promissory note to be paid in two installments over the next year. The agreement stated that the willingness of the Archers to resolve the case stemmed from both the non-taxable nature of a part of the consideration for the settlement and the numerous defenses asserted by the Warners. An addendum to the settlement agreement specified that the agreement would be declared null and void if the criminal charges pending against Leonard Warner were not dismissed by the State of North Carolina. The promissory note, from Leonard and Arlene Warner and Hosiery Industries, Inc., was secured by two deeds of trust—one on the Warners' home and another on business property owned by Hosiery Industries, Inc. The Warners received both a general and mutual release of all pending and future claims by the Archers. Specifically, the general release stated the Archers "do hereby release and forever discharge the . . . [Warners] from the beginning of the world to the date of this release arising out of or relating to the matter of the litigation in Guilford County Superior Court, File No. 92-CVS-7777. . . ." In both releases, neither party admitted liability or wrongdoing; moreover, specific clauses stated that the payment of money should not be construed as an admission of liability. There was no mention of bankruptcy in the settlement package.

On November 11, 1995, the first payment on the $100,000 promissory note became due. When the Warners defaulted on this payment, the Archers sued in Superior Court in Guilford County on December 4, 1995.[2] The suit was for collection on the note. On February 5, 1996, while this collection suit was still pending, Leonard and Arlene Warner filed for relief under Chapter 13 of the Bankruptcy Code,

---

[2] The second payment was due on May 11, 1996. The Warners defaulted on this payment as well, being in bankruptcy.

3

which was converted to a case under Chapter 7 on October 29, 1996. The present dispute originated on January 29, 1997 when the Archers filed an adversary proceeding in the United States Bankruptcy Court for the Middle District of North Carolina, seeking a judgment for the amount due under the promissory note and a determination that such indebtedness was non-dischargeable under Section 523(a) of the Bankruptcy Code, 11 U.S.C. § 523(a). As grounds for asserting the non-dischargeability of this indebtedness, the Archers incorporated by reference in the bankruptcy adversary complaint the multiple allegations contained in their suit in the state court.[3] These were the only grounds there stated for asserting non-dischargeability.[4] Defendant

———

[3] In the Archers' adversary complaint to determine dischargeability of debt, Section 13 of the complaint states:

> Plaintiffs expressly incorporate by reference the terms and conditions of the Amended Complaint plaintiffs filed against defendants in Guilford County Superior Court, case no. 92 CVS 7777, setting forth causes of action for, among other matters, fraud, misrepresentation, conspiracy to defraud, conspiracy to take plaintiffs' property by false pretenses in violation of criminal statute G.S. §14-100, and, in general, for deliberate, intentional, willful, wanton, malicious, and wrongful acts of defendants in an elaborate scheme by which defendants took hundreds of thousands of dollars from plaintiffs by false pretenses.

[4] The Archers attempted later to claim fraud-in-the-inducement of the settlement as well. On June 25, 1998 the Archers moved to amend their adversary complaint to show, among other things, that Mrs. Warner had committed fraud when she and her husband induced the Archers to accept the $100,000.00 note. The proposed amended complaint was filed with the motion, but, when the motion came on for hearing, no attorney appeared for either side and the bankruptcy court justifiably denied the motion to amend the complaint, a plaintiff's motion for discovery, and a motion by Arlene Warner for summary judgment. This order was filed October 6, 1998.

On February 2, 1999 the court set the adversary proceeding for trial on June 1, 1999, and on May 27, 1999 the Archers renewed their motion to amend the complaint. The trial having been continued at the instance of the Archers, the pending motions to amend the complaint came on before the bankruptcy court for hearing on June 1, 1999, along with other

Arlene Warner denied any misconduct on her part and asserted an affirmative defense of settlement of the original state court suit.[5] She

___

motions and objections by both the Archers and Mrs. Warner, all of whom were represented by their attorneys at that hearing. The court denied all of the motions and its order filed June 2, 1999 provided as the reasons: "For the reasons stated in open court." Among the motions denied was the renewed motion to amend the complaint. Although the reasons were stated in open court, they are not included in the record in this case, and we are left to speculate as to what they were. We are asked to decide, in effect, that the bankruptcy court abused its discretion when it did not permit the amendment of the complaint in the adversary proceeding.

A reading of the amended complaint presented to the bankruptcy court on May 27, 1999 does not charge any fact that Mrs. Warner misrepresented to the Archers, unless it be that she and her husband could only borrow or otherwise come up with $200,000.00 of the agreed $300,000.00 settlement, leaving $100,000.00 to be paid under the note, as has been mentioned before. While the Archers now argue that the reason the note is not dischargeable in bankruptcy is because Mrs. Archer intended at the outset not to pay it, that reason was not presented to the bankruptcy judge in the amended complaint at the hearing on June 1, 1999 resulting in the June 2, 1999 order.

While the amended complaint contains many conclusions charging fraudulent or like conduct against Mrs. Warner, a reading of that paper does not contain sufficient factual allegations for us to conclude that the bankruptcy court abused its discretion when it did not permit the amendment. In that respect, we note that the prayer of the amended complaint includes the following:

> 5. That in the alternative, if defendant Arlene Warner's obligation to plaintiffs is determined to be discharged in Bankruptcy, that plaintiffs be declared released from any agreement and obli-
> gation to take no action to cause criminal proceedings to be brought against Arlene Warner or her son, Stuart Warner.

That aspect of the prayer alone would seem to be sufficient reason to justify the action of the bankruptcy court in denying the sought for amendment of the complaint, but, again, since the record does not disclose the reasons, we decline to find the bankruptcy court abused its discretion in its denial of the motion to amend the complaint, and do not speculate as to its reasons.

[5] Arlene Warner contested this issue of non-dischargeability in the bankruptcy court. We are told her husband, Leonard Warner, did not. No

argued that the Archers may not rely upon the same alleged misconduct in the original suit in the state court as grounds for non-dischargeability because that suit was settled *in toto*.

On August 24, 1999 the bankruptcy court had ordered the trial bifurcated, first hearing issues on what it called the affirmative defense.[6] On August 26, 1999 the case was tried on the affirmative defense of the dischargeability action. The bankruptcy court decided in favor of Mrs. Warner, upholding her affirmative defense. The Archers appealed this decision contending that the bankruptcy court misinterpreted the exception to dischargeability under 11 U.S.C. § 523(a)(2)(A). The district court affirmed the bankruptcy court's decision. It concluded that the releases and settlement agreement created a novation, substituting a dischargeable contract debt for a fraud-based tort claim which may not have been dischargeable. The district court continued by holding that the argument of fraud-in-the-inducement of the settlement agreement was not properly before the court because such claim was not presented to or decided by the bankruptcy court. Nevertheless, the district court commented that any successful fraud-in-the-inducement contention must establish that Mrs. Warner planned all along to file bankruptcy to escape her contractual settlement commitments with the Archers. The district court doubted such a plan because the Warners had ready paid $200,000 in cash pursuant to the settlement agreement, and had given deeds of trust on real estate to secure the payment of the note as well. In any event, because of the novation which we affirm, see *infra*, and our opinion that the Archers have not shown an abuse of discretion by the bankruptcy court in its refusal to permit the amendment to the adversary complaint, that is a contention upon which we express no opinion.

---

issue with respect to the liability of Leonard Warner is before this court on appeal, and, again, we are told that the Warners are divorced.

[6] As previously noted, the Archers' motion to amend their complaint was last denied by the bankruptcy court on June 2, 1999. Whether the bankruptcy court has foreclosed such a claim is a question we do not decide. The bankruptcy court called for trial the issue presented here, which was whether the settlement agreement effected a novation of the dischargeability claim which might have existed into a claim upon the settlement which does exist. No evidence was offered in the bankruptcy court as to fraudulently inducing the settlement.

II.

We have jurisdiction to hear this case under 28 U.S.C. § 158(d). This court "reviews the judgment of a district court sitting in review of a bankruptcy court de novo, applying the same standards of review that were applied in the district court." *In Re Biondo*, 180 F.3d 126, 130 (4th Cir. 1999).[7] Specifically, we review the factual findings of the bankruptcy court for clear error, while we review questions of law de novo. *In Re Biondo*, 180 F.3d at 130.

The pertinent bankruptcy code, 11 U.S.C. § 523, provides:

> § 523. Exceptions to discharge
>
> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt . . . .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by —
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting debtor's or an insider's financial condition; . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity . . . .

The issue we address is whether the district court erred in determining that a prepetition settlement of claims involving the same claims pursued here, alleged fraud or intentional tort, extinguished the Archers' subsequent non-dischargeability claims under Section 523(a)(2)(A) when Mrs. Warner filed for bankruptcy relief without having paid the settlement promissory note. As noted by the district court, there is a split among the circuits concerning this issue. Under

_____

___

[7] We note in passing that the Archers do not depend on *Biondo*.

7

one line of cases, a settlement agreement does not distinguish a dischargeability claim under Section 523(a). See *United States v. Spicer*, 57 F.3d 1152 (D.C. Cir. 1995); *Greenberg v. Schools*, 711 F.2d 152 (11th Cir. 1983). According to this line of cases, examining the underlying fraudulent allegations leading to the settlement agreement best effectuates Congressional policy by its construction of the statutes as not permitting the discharge of debts that Congress intended to survive bankruptcy. *Greenberg v. Schools*, 711 F.2d 152 (11th Cir. 1983). The opposing line of cases favors the basic principle of encouraging settlements by way of freedom to enter into settlement agreements, regardless of the nature of the claim subject to the settlement agreement. See *In re Fischer*, 116 F.3d 388 (9th Cir. 1997); *In re West*, 22 F.3d 775 (7th Cir. 1994); *Maryland Casualty Co. v. Cushing*, 171 F.2d 257 (7th Cir. 1948). Under this theory, parties willing to settle disputes over fraud, misrepresentation, or like tort claims may do so by way of settlement through contract, and such contractual claims are then dischargeable in bankruptcy. Otherwise, the incentive to settle is gone.

We agree with the district court and the bankruptcy court that the better reasoned decisions are those of the Seventh and Ninth Circuits rather than those of the District of Columbia and Eleventh Circuits. So we follow *West*, *Md. Casualty*, and *Fischer*. We are of opinion that Congress did not intend that 11 U.S.C. § 523(a) be construed, as a reversal here would require, so as to discourage the settlement of claims because they might be subject to freedom from discharge under § 523(a).

When following the novation theory,[8] the terms of the settlement should be examined to determine whether the non-dischargeability claims under Section 523(a)(2)(A) were released. The Archers would have us hold that courts must determine whether the underlying factual basis for the settlement agreement consisted of fraud; however, under the novation theory, courts need only address the validity and

---

[8] While novation is sometimes interpreted to mean the replacement of a third party to an existing contract, see *Black's Law Dictionary*, 7th Ed., 1999, p. 1091, we, like the Ninth Circuit, use the term in the context of § 523(a)(2)(A) to express the substitution of a contract claim for a tort claim through a settlement agreement, the Seventh Circuit use.

completeness of the bargained for agreement and release. We review these factual issues for clear error.

The settlement package, consisting of the settlement agreement with addendum, two releases, a promissory note, and two deeds of trust, completely released Arlene Warner from potential non-dischargeability claims under Section 523(a)(2)(A). The settlement agreement referred explicitly to the general and mutual releases. The general release further announced the complete waiver of all pending and future related personal claims against Arlene Warner. It provides that the Archers

> do hereby release and forever discharge the [Warners] from any and every right, claim, or demand . . . arising out of or relating to the matter in Guilford County Superior Court, excepting only obligations under a Note and deeds of trust executed contemporaneously herewith.

This release continued by specifying the claims released:

> The payment of the sum of $300,000 . . . is paid to [the Archers] in settlement of their personal claims for emotional distress/personal-injury-type damages they claim to have suffered for the torts of fraud, intentional misrepresentation, intentional infliction of emotional distress, and negligent infliction of emotional distress. The parties further acknowledge that all sums set forth above constitute payment for claims of damages resulting from personal injuries or sickness or mental and emotional distress in a case involving prosecution of a legal suit or action based upon tort or tort-type rights . . . .

As noted in *West*, "A promissory note does not discharge the underlying obligation unless the parties expressly release the old and substitute the new." *West*, 22 F.3d at 778. The settlement agreement and promissory note here, coupled with the broad language of the release, completely addressed and released each and every underlying state law claim.

9

We therefore follow *Fischer*, *West*, and *Md. Casualty* and affirm the judgment of the district court that the prepetition settlement of claims involving alleged fraud and intentional tort extinguished the Archers' subsequent non-dischargeability claim under Section 523(a) when Mrs. Warner filed for bankruptcy relief without having paid the entire amount of the settlement.

The judgment of the district court is accordingly

*AFFIRMED*.

TRAXLER, Circuit Judge, dissenting:

A unanimous Supreme Court reminded us as recently as four years ago that "[t]he Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an `honest but unfortunate debtor.'" *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998) (quoting *Grogan v. Garner*, 498 U.S. 279, 287 (1991)). To this end, "Congress intended the fullest possible inquiry" into the nature of debts for purposes of determining dischargeability. *Brown v. Felsen*, 442 U.S. 127, 138 (1979). Because I believe the approach employed by the D.C. and Eleventh Circuits in *United States v. Spicer*, 57 F.3d 1152 (D.C. Cir. 1995), and *Greenberg v. Schools*, 711 F.2d 152 (11th Cir. 1983) (per curiam), ultimately accomplishes the congressionally enacted policy objective embodied in the nondischargeability provisions, I respectfully dissent.

I.

There are two competing views to the main issue in this case and both have much to commend them. The bankruptcy court adopted the approach of the Ninth and Seventh Circuits reflected in *In re West*, 22 F.3d 775 (7th Cir. 1994), and *Key Bar Invs., Inc. v. Fischer* (*In re Fischer*), 116 F.3d 388 (9th Cir. 1997) (per curiam). The analysis employed in those cases is best illustrated by the test articulated by the Ninth Circuit in *Fischer*: "[I]f it is shown that the [promissory] note, by express agreement is given and received, as a discharge of the original obligation or tort action, then the execution of the note

10

extinguishes the tort action and it would be error for the court to look behind the note." *Fischer*, 116 F.3d at 390 (internal quotation marks omitted); *accord West*, 22 F.3d at 778 ("[I]f it is shown that the [promissory] note [that was executed pursuant to the settlement] was given and received as payment or waiver of the original debt and the parties agreed that the note was to substitute a new obligation for the old, the note fully discharges the original debt, and the nondischargeability of the original debt does not affect the dischargeability of the obligation under the note."). The basic rationale of these cases is that, having accepted a settlement and released the underlying tort action, the plaintiff voluntarily accepted a contract debt, which is dischargeable under the bankruptcy laws, in lieu of pursuing a potentially nondischargeable tort debt.

The competing approach adopted by the D.C. and Eleventh Circuits in *Spicer* and *Greenberg* can be quickly illustrated by examining *Spicer*. In that case, John Spicer had been convicted of one count of interstate transportation of money obtained by fraud from the United States Department of Housing and Urban Development and had thereafter settled the government's multiple civil claims against him. In accord with the civil settlement agreement, Spicer executed two promissory notes and the government expressly released its civil claims against him. Spicer later filed for bankruptcy protection and, relying on *West*, sought to have the promissory notes discharged. Addressing *West* directly, the D.C. Circuit declared that it could not "agree with a rule under which, through the alchemy of a settlement agreement, a fraudulent debtor may transform himself into a non-fraudulent one, and thereby immunize himself from the strictures of § 523(a)(2)(A)." *Spicer*, 57 F.3d at 1155. The court found the government's release of the underlying tort action immaterial, declaring that "a fraudulent debtor may not escape nondischargeability, imposed as a matter of public policy by Congress . . ., merely by altering the *form* of his debt through a settlement agreement." *Id.* at 1156. Accordingly, the court affirmed the bankruptcy court's holding that the promissory notes executed by Spicer were not dischargeable. *Id.* at 1157. Thus, simply stated, the *Spicer* approach is a policy-based approach intended to effectuate the considered judgment of Congress.

II.

The Archers urge us to adopt the *Spicer* approach and allow them the opportunity to prove in bankruptcy court that Arlene Warner com-

11

mitted fraud against them and that the promissory note executed as part of the settlement of the state-court tort action is therefore nondischargeable under § 523(a)(2)(A). In my judgment, Supreme Court precedent strongly suggests that the *Spicer* approach is the correct one.

In 1979, for example, the Supreme Court decided *Brown*. In that case, G. Garvin Brown had been guarantor of a loan that financed Mark Paul Felsen's business. When the creditor instituted a collection action against Brown and Felsen, Brown filed a counterclaim against Felsen alleging that Felsen had induced Brown to sign the guarantee "by misrepresentations and non-disclosures of material facts." *Brown*, 442 U.S. at 128 (internal quotation marks omitted). The suit settled and was reduced to a consent judgment indicating that Brown should have judgment against Felsen but not indicating the cause of action upon which the liability was based or whether Felsen had in fact engaged in fraud. Felsen subsequently filed for bankruptcy, and Brown sought to challenge in bankruptcy court the dischargeability of Felsen's debt to him. Felsen argued that because the state-court suit had been reduced to a consent judgment and the documents evidencing that judgment did not result in a finding that he had in fact committed fraud, res judicata barred further inquiry into the nature of the debts. Gleaning from the legislative history of the Bankruptcy Act "[s]ome indication that Congress intended the fullest possible inquiry" into the true nature of debts for purposes of determining dischargeability, the Supreme Court unanimously rejected that argument. *Id.* at 138. After "careful inquiry," the Court concluded that "the policies of the Bankruptcy Act" would best be served by allowing Brown to "submit[ ] additional evidence to prove his case." *Id.* at 132.

Twelve years after *Brown*, the Supreme Court was asked in *Grogan* to resolve a circuit split on the question of whether, in bankruptcy court, a creditor was required to prove the nondischargeability of his claim by a preponderance of the evidence or by clear and convincing evidence. The Court unanimously found that the preponderance standard best reflected the "congressional decision to exclude from the general policy of discharge certain categories of debts—such as . . . liabilities for fraud," and the Court therefore held that a creditor need only prove that his claim was nondischargeable under the preponderance standard. *Grogan*, 498 U.S. at 287. "We think it unlikely," the

12

Court declared, "that Congress, in fashioning the standard of proof that governs the applicability of these provisions, would have favored the interest in giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud." *Id.*

And finally, in 1998, in *Cohen*, a unanimous Supreme Court yet again stressed the importance of reinforcing the congressional policy objective underlying the nondischargeability provisions. In *Cohen*, the Court decided that a treble damages award that was imposed as punishment for a state-court defendant's fraudulent conduct was nondischargeable under the fraud exception to dischargeability, rejecting the debtor's argument that only an amount equal to the actual value obtained by fraud should be nondischargeable. *Cohen*, 523 U.S. at 219. In support of its decision, the Court cited "the historical pedigree of the fraud exception, and the general policy underlying the exceptions to discharge." *Id.* at 223.

Thus, the message delivered by a unanimous Supreme Court on three separate occasions has been clear. In deciding cases dealing with the fraud exceptions to dischargeability, courts should effectuate congressional policy objectives by conducting the fullest possible inquiry into the nature of the debt and limiting relief to the honest but unfortunate debtor. The *Spicer* approach is squarely grounded in these policy interests.

Under any other approach, a defendant can completely immunize himself from § 523 by simply settling any fraud claims against him with a promise to pay, having the plaintiff release the underlying tort action as part of the settlement, and then filing for bankruptcy. The acceptance of the defendant's promise to make payment should not prevent the plaintiff, upon a default by the defendant and subsequent filing of bankruptcy, from showing the bankruptcy court that the debt had its genesis in fraud. If, as the Supreme Court has declared, "the mere fact that a conscientious creditor has previously reduced his claim to judgment should not bar further inquiry into the true nature of the debt," *Brown*, 442 U.S. at 138, then I see no reason why the mere fact that a conscientious creditor has previously reduced his claim to settlement should bar such an inquiry. *See Ed Schory & Sons, Inc. v. Francis* (*In re Francis*), 226 B.R. 385, 391 (B.A.P. 6th Cir. 1998) (choosing to "follow[ ] *Spicer* because *Brown v. Felsen* com-

13

pels the *Spicer* result"); *see also Giaimo v. Detrano* (*In re Detrano*), 266 B.R. 282, 288 (E.D.N.Y. 2001) (finding *Brown* "[i]nstructive"). Moreover, because the nondischargeability provisions of the Bankruptcy Code evidence a considered congressional policy to favor "the interest in protecting victims of fraud" over "the interest in giving perpetrators of fraud a fresh start," *Grogan*, 498 U.S. at 287, and because the Supreme Court has so strongly and unwaveringly signalled through three uninamimous opinions over the course of twenty years that that policy objective is to be jealously protected, I would adopt the *Spicer* approach.\* *Cf. Foley & Lardner v. Biondo* (*In re Biondo*), 180 F.3d 126, 130 (4th Cir. 1999) (noting the importance of "ensuring that perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code").

III.

For these reasons, I would elevate substance over form and allow the Archers to offer such proof as they might have to show that Arlene Warner's debt resulted from a fraud perpetrated upon them. Therefore, I respectfully dissent.

---
___

\*I do not view the settlement documents as forbidding the Archers from proving in bankruptcy court the nondischargeability of the debt because, among other things, the releases specifically excepted the Warners' obligations under the promissory note and deeds of trust, (J.A. 45, 48), which I would interpret as permitting a full and fair hearing on the dischargeability of the debt in bankruptcy court.

14