**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-1508**

ULTRA LITHO PYT, LIMITED,

              Plaintiff - Appellee,

        v.

JEFFREY F. MOORE,

              Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt.  Marvin J. Garbis, Senior District Judge.  (8:07-cv-01444-MJG)

Argued:  September 23, 2009          Decided:  October 15, 2009

Before MOTZ, Circuit Judge, HAMILTON, Senior Circuit Judge, and Irene M. KEELEY, United States District Judge for the Northern District of West Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

Rand Lewis Gelber, LAW OFFICES OF RAND L. GELBER, Rockville, Maryland, for Appellant.  Damon Keith Bernstein, LAW OFFICE OF DAMON K. BERNSTEIN, Rockville, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In this Chapter 7 bankruptcy case, a creditor commenced an advisory proceeding to determine the dischargeability of an alleged debt. After a bench trial, the bankruptcy court granted judgment for the creditor. In re Moore, 365 B.R. 589 (Bankr. D. Md. 2007). The debtor, Jeffrey Moore, appeals to us from the district court's judgment affirming the bankruptcy court order. We too affirm.

I.

Moore, founded, owned, and operated International Graphic Services, Inc. ("IGS"), a Maryland corporation in the business of brokering sales of printing presses. In 2000, Moore, on behalf of IGS, executed two agreements to broker the sale of a 7-color Heidelburg printing press ("Press") from Ultra Litho Pyt, Limited to Nicholas Jannes. Ultra sought to sell the Press to obtain sufficient funds and space to purchase a larger press from KBA North America.

Pursuant to the first contract with Jannes, IGS agreed to sell the Press for $1.65 million. The sale was contingent on IGS obtaining ownership of the Press. Jannes, in accordance with the contract, paid IGS a deposit of $412,500. Pursuant to the second contract with Ultra, IGS agreed to purchase the Press for $1.2 million. IGS paid Ultra a $120,000 deposit, using

2

proceeds of the Jannes deposit, and agreed to pay the balance with an irrevocable letter of credit upon removal of the Press "no later than February 16, 2001." IGS planned to use the letter of credit it expected to obtain from Jannes to close the deal with Ultra. Due to timing differences between the obligations of Jannes to IGS and IGS to Ultra, however, these initial transactions failed to close.

Subsequently, Ultra, Jannes, and KBA, in collaboration with IGS, negotiated new agreements to sell the Press. Under one agreement ("Press Agreement"), Ultra agreed to sell the Press to KBA. In turn, KBA agreed to sell the Press to Jannes for $1.65 million, crediting Jannes for the $412,500 deposit initially paid to IGS. Moore, on behalf of IGS, initially refused to sign the Press Agreement and did so only after all parties agreed to a broad release of IGS and its officers and shareholders, among others.

Under another agreement ("Settlement Agreement"), which memorialized a telephone conversation between Moore and Ultra co-owner and director Colin Finck, Ultra and IGS "settle[d] their differences with regard to the Contract by IGS and the holding of the deposit from Jannes by IGS and allow[ed] payment to IGS from said deposit." The Settlement Agreement released IGS of its obligations under the previous contract and stipulated, among other things, that Ultra had already received

$120,000 of the deposit, that IGS would keep $150,000 of the deposit as consideration for services provided to Ultra and Jannes, and that IGS was to wire $127,031.25 into Ultra's bank account. Although Finck verified with Jannes and Moore that Jannes had, in fact, sent the deposit to IGS, he did not inquire whether IGS had spent the funds. The bankruptcy court determined that Ultra would not have agreed to the Press Agreement if it had known that IGS had spent the Jannes deposit.

IGS never paid the $127,031.25 to Ultra. By the time Moore executed the Settlement Agreement, IGS had spent the entire Jannes deposit and had no other means by which to pay Ultra. Moore filed a petition for Chapter 7 bankruptcy on August 17, 2005. Thereafter, Ultra filed a complaint pursuant to 11 U.S.C. § 523(a)(2)(2006) to determine the dischargeability of $287,031.25 (the $127,031.25 owed Ultra plus the $150,000 retained by IGS as commission).

## II.

After a bench trial, the bankruptcy court issued a well-reasoned opinion, in which it granted judgment to Ultra. The bankruptcy court determined that Moore's $127,031.25 debt to Ultra was an extension of credit obtained by fraudulent means

4

and thus non-dischargeable.[*]  Moore appealed that judgment to the district court, which affirmed.  <u>See</u> J.A. 343-345.

### III.

Moore now appeals to this court.  We review the judgment of a district court sitting in review of a bankruptcy court de novo, reviewing the bankruptcy court's factual findings for clear error and its legal determinations de novo.  <u>In re Biondo</u>, 180 F.3d 126, 130 (4th Cir. 1999).

After careful consideration of the record, the briefs and oral arguments, and the applicable law, we affirm on the basis of the bankruptcy court's well-reasoned opinion.

<u>AFFIRMED</u>

---

[*] The bankruptcy court also concluded that IGS obtained property by fraudulent means through the acquisition of a sole ownership interest in the $150,000 commission.  The bankruptcy court's finding of fact that "Ultra Litho and IGS operated as if, and understood that, the Jannes Deposit was theirs to divide," sufficiently supports the conclusion that "Ultra Litho had a sufficient stake in the Jannes Deposit that IGS's receipt of $150,000 of it by misrepresentation constituted receiving 'property' from Ultra Litho."  365 B.R. at 602.  The bankruptcy court, however, entered judgment solely for the $127,031.25.