**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 08-1646**

———————

In re:  PETER A. SHARP; JOYCELYN F. SHARP,

            Debtors,

------------------------------

COLOMBO BANK,

            Plaintiff – Appellant,

      v.

PETER A. SHARP; JOYCELYN F. SHARP,

            Defendants – Appellees,

      and

ROGER SCHLOSSBERG,

            Trustee.

———————

Appeal from the United States District Court for the District of
Maryland, at Greenbelt.  Deborah K. Chasanow, District Judge.
(8:07-cv-02935-DKC)

———————

Argued:  May 12, 2009              Decided:  August 14, 2009

———————

Before WILKINSON and KING, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

———————

Affirmed by unpublished per curiam opinion.  Senior Judge
Hamilton wrote a concurring opinion.

———————

**ARGUED**: Stephen Warren Nichols, DECKELBAUM, OGENS & RAFTERY, CHARTERED, Bethesda, Maryland, for Appellant. Matthew Gernet Summers, BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP, Baltimore, Maryland, for Appellees. **ON BRIEF**: Nelson Deckelbaum, DECKELBAUM, OGENS & RAFTERY, CHARTERED, Bethesda, Maryland, for Appellant. Joseph J. Bellinger, BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP, Baltimore, Maryland, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

By way of adversary proceedings in bankruptcy court, appellant Colombo Bank (the "Bank") sought rulings that the debt obligations of Peter and Joycelyn Sharp on a $500,000 loan were not subject to discharge. In support thereof, the Bank relied on two statutory "[e]xceptions to discharge" provided for in subsections (2)(A) and (2)(B) of 11 U.S.C. § 523(a). After conducting a trial in 2004, the bankruptcy court ruled against the Bank, concluding that neither of the asserted exceptions were applicable, and that the Sharps' debt obligations were thus dischargeable.[1] The Bank first appealed to the district court, which affirmed the rulings of the bankruptcy court. The Bank has now appealed to this Court and, as explained below, we also affirm.

I.

A.

On August 20, 2002, and October 28, 2002, respectively, Joycelyn and Peter Sharp filed separate Chapter 7 bankruptcy petitions in Maryland. As part of the bankruptcy proceedings, the Sharps sought discharge of their debt obligations arising

---

[1] Although Joycelyn Sharp was a party in the bankruptcy court proceedings and secured a favorable judgment, the Bank did not appeal with respect to her.

3

from a $500,000 loan that the Bank made to them in 1995 (the "Loan"). The Bank challenged any such discharge, maintaining that the obligations were nondischargeable in bankruptcy because the Sharps had made false and fraudulent representations to obtain the Loan. On November 4, 2002, and March 13, 2003, the Bank initiated separate adversary proceedings against the Sharps. As to Peter Sharp, the Bank asserted that his debt obligation on the Loan was nondischargeable under both subsection (2)(A) and subsection (2)(B) of 11 U.S.C. § 523(a). The Bank made the same assertion of nondischargeability as to Joycelyn Sharp, but relied on subsection (2)(B) only.

B.

Under the Bankruptcy Code, a debtor is entitled to the discharge of his debt obligations at the conclusion of Chapter 7 bankruptcy proceedings, absent the applicability of a statutory exception. See 11 U.S.C. § 523(a) (identifying nineteen statutory exceptions to discharge). In these proceedings, the Bank contends that Peter Sharp falsely and fraudulently submitted two documents to the Bank when he applied for the Loan — a financial disclosure statement, and a title insurance commitment with an attached title abstract — both of which concealed a home equity line of credit referred to here as the "Signet Loan." The Bank maintains that each of those

4

submissions implicates an exception to discharge specified in subsections (2)(A) and (2)(B) of § 523(a).[2]

Notably, subsection (2)(A) disallows the discharge of a debt obligation that was obtained by, inter alia, "actual fraud." 11 U.S.C. § 523(a)(2)(A). In these proceedings, the Bank alleged and sought to prove that Sharp had engaged in actual fraud in securing the Loan. As we recently explained in Nunnery v. Rountree (In re Rountree), a creditor's proof of actual fraud under subsection (2)(A) requires satisfaction of the elements of common law fraud: "(1) false representation, (2) knowledge that the representation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of damages." 478 F.3d 215, 218 (4th Cir. 2007); see also Field v. Mans, 516 U.S. 59, 69 (1995) (explaining that

---

[2] Subsection (2)(A) of § 523(a) provides that Chapter 7 bankruptcy does not discharge a debtor from any debt obligation obtained by

> false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition.

By contrast, subsection (2)(B) of § 523(a) provides that Chapter 7 bankruptcy does not discharge a debtor from any debt obligation obtained by

> use of a statement in writing . . . (i) that is materially false; (ii) respecting the debtor's . . . financial condition; (iii) on which the creditor . . . reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive.

"operative terms" of subsection (2)(A) are "common-law terms"). Significantly, subsection (2)(A) does not apply if the disputed statement is "respecting the debtor's . . . financial condition." § 523(a)(2)(A); see also Blackwell v. Dabney (In re Blackwell), 702 F.2d 490, 491 (4th Cir. 1983) (discussing scope of phrase "respecting the debtor's . . . financial condition"). Subsection (2)(B), on the other hand, was designed to bar the bankruptcy discharge of a debt obligation that was induced by a false written statement of the debtor's financial condition. See Field, 516 U.S. at 66. In order to satisfy subsection (2)(B), a creditor must prove five elements: (1) "use of a statement in writing," (2) "that [was] materially false," (3) "respecting the debtor's . . . financial condition," (4) "on which the creditor . . . reasonably relied," and (5) "that the debtor caused to be made or published with intent to deceive." § 523(a)(2)(B).

These two subsections of § 523(a) were enacted to address distinct factual situations, and, of importance here, they differ with respect to the element of reliance — that is, the extent to which the creditor altered its position because of the debtor's misrepresentations. Whereas subsection (2)(A) requires the creditor to prove "justifiable reliance," subsection (2)(B) mandates the more demanding showing of "reasonable reliance." See Field, 516 U.S. at 61, 66.

6

C.

Although the Bank initiated separate adversary proceedings against the Sharps, the bankruptcy court conducted a consolidated trial on October 4, 2004, at which it received evidence and heard the argument of counsel.  After trial, the bankruptcy court filed two separate decisions, ruling that the Bank had failed to satisfy subsections (2)(A) and (2)(B). First, on April 1, 2005, the court filed a decision rejecting the Bank's subsection (2)(B) contention.  See Colombo Bank, F.S.B. v. Sharp (In re Sharp), No. 03-01098 (Bankr. D. Md. Apr. 1, 2005) ("Sharp I").[3]  Thereafter, on September 28, 2007, the court also rejected the Bank's subsection (2)(A) contention. See Colombo Bank, F.S.B. v. Sharp (In re Sharp), No. 03-01098 (Bankr. D. Md. Sept. 28, 2007) ("Sharp II").[4]

1.

In its Sharp I decision, the bankruptcy court made extensive findings of fact predicated on the trial evidence. The relevant findings are as follows:

> 1. On September 25, 1995, the Bank made [the Loan] to the Sharps in the amount of $500,000 . . . . As security, the Bank received a mortgage which it

---

[3] Sharp I is found at J.A. 65-73.  (Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

[4] Sharp II is found at J.A. 163-74.

7

believed was a second priority lien on the Sharps' residence in Bethesda, Maryland (the "Maryland Property") and a second priority lien on a vacation property located on Kiawah Island, South Carolina (the "South Carolina Property").

2. The Bank understood and believed that its lien on the Maryland Property was second only to a first priority mortgage in favor of Chase Bank of Maryland ("Chase") in the principal amount of $750,000. Moreover, it is undisputed that the Bank understood its lien on the South Carolina Property was second to a first priority mortgage in favor of Prudential Home Mortgage Company, Inc. ("Prudential") in the principal amount of $347,000.

3. Contrary to the Bank's expectation and belief, its mortgage on the Maryland Property was in fact in third position, behind a prior-recorded second mortgage to secure a home equity line of credit in the maximum principal amount of $75,000 (the "Signet Loan"). The Signet mortgage was senior in priority to the Bank's mortgage because the former was recorded on March 6, 1995.

4. In connection with the loan negotiations, [Peter Sharp submitted a financial disclosure statement to the Bank] consisting of two pages on a Bank of Maryland form, purporting to describe Mr. Sharp's assets and liabilities as of December 12, 1994. The principal assets listed were ownership of First Charter Title Corporation ("First Charter") (valued at $3 million), the Maryland Property (valued at $1.3 million) and the South Carolina Property (valued at $525,000). The principal liabilities disclosed were the first mortgages on each of the Maryland and South Carolina properties (in the principal amounts of $748,000 and $367,000, respectively). The Signet Loan, which had not yet been made in December 1994, was not disclosed.

. . . .

6. It is undisputed that the disclosure did not mention the Signet Loan which, as mentioned, had not yet been made. The question is whether presentation of a December 1994 disclosure in March or April 1995,

8

after the Signet Loan had been made, was a fraudulent misrepresentation. Mr. Sharp testified (i) he believed the Signet mortgage had not been recorded because the line of credit had not yet been drawn and (ii) he verbally disclosed the Signet line of credit and his understanding that it was not yet recorded to [Bank Chairman] Fernebok. In his deposition, Mr. Fernebok denies that Mr. Sharp made any such disclosure. Unfortunately, no evidence was submitted by either side with respect to Signet's loan practices at the time, which probably would have resolved the issue. The Court is required, then, to rely on its assessment of Mr. Sharp's testimony. After careful consideration, the Court finds that [the] testimony was not credible.

7. Also undisputed is that, in connection with the Loan closing, Mr. Sharp's company, First Charter, supplied to the Bank a title insurance commitment dated September 11, 1995, to which was attached a title abstract with respect to the Maryland Property. Further, it is undisputed that this title abstract did not reflect the Signet mortgage, which had been recorded in March 1995. Mr. Sharp explained that this happened because the title abstract had been prepared in January [1995], at which time the Signet mortgage had not yet been recorded. The Court cannot and does not believe that a professional title insurance agent — and this was, after all, Mr. Sharp's main business at the time — would issue a title insurance commitment in September based on title work performed in January unless, as the Bank contends, it was a deliberate act of nondisclosure. This is clinching proof that Mr. Sharp misled the Bank and that he deliberately furnished a stale financial disclosure and a stale title abstract which he knew did not reflect the Signet Loan and mortgage.

8. [Two days] after the closing, [the Sharps executed] an affidavit certifying to the Bank that the December 1994 financial disclosure was a full and fair description of the Sharps' financial condition as of the closing. . . . Plainly the affidavit was misleading, but the Court finds that . . . the Bank obviously did not rely on the affidavit to its detriment, as the Loan had already been funded.

9. Moreover, the Bank failed to establish that Mr. Sharp's pre-funding nondisclosure of the Signet Loan was material. Rather, as evidenced by the [Bank Chairman's] credit memorandum,[5] it appears [the Chairman] was "hot" to make th[e] [L]oan because he hoped to develop a banking relationship with Mr. Sharp whereby First Charter would channel escrow closing funds through the Bank. Moreover, the primary credit underwriting criterion for approving the [L]oan, as reflected in [the Bank Chairman's] deposition, was Mr. Sharp's valuation of First Charter at $3 million. It does not appear of record that [the Bank Chairman] made any effort to verify that valuation, which in hindsight proved to be greatly overstated. The second credit underwriting criterion was Mr. Sharp's expectation of $370,000 in commissions for brokering two loan transactions, which were the principal anticipated source of repayment of the Loan (hence its having only a one year term). It does not appear of record that [the Bank Chairman] made any effort to "due diligence" those commissions, which apparently failed to materialize. The security furnished by the mortgages was thus only the third credit underwriting criterion and the Bank's analysis was that there was a combined $800,000 equity cushion in the Maryland and South Carolina Properties. In other words, the Bank's loss was caused by the parties' shared mistaken evaluations of Mr. Sharp's ability to repay the [L]oan from income and/or the value of his business and the value of the properties pledged as collateral. In this context, the Bank has not demonstrated that an undisclosed $75,000 second mortgage, sandwiched between a $750,000 first and a $500,000 third, was material.

---

[5] Before consummating the Loan, the Bank's Chairman, Joel Fernebok, generated an undated internal credit memorandum recommending that the Loan be made "based on Mr. Sharp's ability to generate funds thru [First Charter] and the equity in his homes." J.A. 396. The Fernebok credit memorandum explained that First Charter expected to close on two major transactions in the first quarter of 1996, and thereby garner $370,000 in commissions. The memorandum also reflected that Sharp had a net worth of $3,987,700, primarily from his ownership of First Charter. It indicated that the Bank is "also benefiting from the operating and escrow accounts of [First Charter]." Id.

10. Finally, the Court cannot find that the Bank reasonably relied on Mr. Sharp's misrepresentation. The uncontroverted testimony was that the Bank made no independent investigation of the Sharps' title. The primary purpose of a title report is to verify the borrower's representations as to the state of title. In the Court's view, a lender relies on a title report supplied by the borrower at its peril.

Sharp I 4-8 (citations and footnotes omitted). After announcing its findings of fact in Sharp I, the bankruptcy court ruled that the Bank had failed to satisfy the requirements of subsection (2)(B). More specifically, the court found that the Bank had failed to prove two essential elements of subsection (2)(B) — materiality and reasonable reliance.[6]

2.

On April 11, 2005, ten days after the Sharp I decision was rendered, the Bank sought reconsideration thereof, requesting the bankruptcy court to also assess the Bank's subsection (2)(A) contention. On September 12, 2005, the bankruptcy court granted

---

[6] In its Sharp I decision, the bankruptcy court determined, with respect to materiality and reasonable reliance, that

[(1)] the Bank has not demonstrated that, in the context of the overall loan transaction, Mr. Sharp's misrepresentations were material to its decision to make the Loan; and [(2)] any such reliance was not reasonable, as the Bank failed to obtain a title report from a disinterested third party.

Sharp I 9.

11

the Bank's reconsideration request and, on September 28, 2007, issued its Sharp II decision.[7]

In Sharp II, the bankruptcy court disposed of the subsection (2)(A) issue and adhered to the Sharp I findings of fact. Relying on these findings, the court made additional findings that "the Bank has conclusively established three of the five elements" of subsection (2)(A) — that Sharp (1) made false representations to the Bank; (2) knew such representations to be false; and (3) made the misrepresentations intending to deceive the Bank. Sharp II 7. Nevertheless, the court found that the Bank had failed to prove the other two essential elements of subsection (2)(A) — justifiable reliance and proximate cause. See id. at 8.

On the issue of justifiable reliance, the bankruptcy court explained that the Bank's reliance on Sharp's misrepresentations was not justified "[g]iven the lack of history between these parties, the irregularity of these documents and the sophistication of the plaintiff." Sharp II 10. The court then

---

[7] Although the Bank had not pursued its subsection (2)(A) contention at trial, the bankruptcy court decided to address this issue because it was raised in the Bank's adversary complaint. In its reconsideration request, the Bank did not seek reconsideration of any of the factual findings made in Sharp I, and the Bank conceded that its subsection (2)(A) contention could be resolved on the existing record.

identified "several factors" that should have placed the Bank on notice that Sharp's representations were suspect:

- "[T]he Debtor produced a stale title report prepared by a company under his control";

- "The Bank . . . was 'hot' to do this deal with the Debtor in the hopes of garnering future business"; and

- "The Bank had no history with the Debtor and no past relationship of trust and confidence upon which it could rely."

Id. "Instead of being prudent," the court explained, "the Bank appears to have been more focused on possible future returns and seemingly ignored the fact that, by the time the Loan closed, the financial disclosure was nine months old and the title report was eight months old." Id. As a result, the bankruptcy court ruled in Sharp II that the Bank had not proven the essential element of justifiable reliance.[8]

D.

On October 5, 2007, the Bank appealed both Sharp I and Sharp II — with respect to Peter Sharp only — to the district

_____

[8] The bankruptcy court also concluded in Sharp II that Sharp's misrepresentations with respect to the Signet Loan were not a proximate cause of the Bank's loss. Rather, the Bank's "primary credit underwriting criterion was the value of Mr. Sharp's business, followed by the value of the commissions he was expecting." Sharp II 11. Thus, the court explained, "the omission of a single $75,000 mortgage when compared to a business that was valued at $3,000,000 and expected commissions in the amount of $370,000" was simply "not determinative." Id.

13

court. Seven months later, on May 5, 2008, the district court affirmed the bankruptcy court's rulings. See Colombo Bank, F.S.B. v. Sharp, No. 8:07-cv-02935 (D. Md. May 5, 2008) (the "District Court Opinion").[9]

In rejecting the Bank's subsection (2)(B) contention, the district court concluded that the bankruptcy court had not erred in ruling in Sharp's favor on the reasonable reliance issue. The district court explained, inter alia, that the Bank's reliance on the financial disclosure statement "was not reasonable," in that Sharp had submitted "irregular[]" documents to the Bank, and the Bank had "failed to conduct a very basic investigation into the status of the title." District Court Opinion 20.[10]

In rejecting the Bank's subsection (2)(A) contention, the district court ruled that the bankruptcy court did not err in finding that the Bank had not justifiably relied on Sharp's misrepresentations in the title insurance commitment and

_____

[9] The District Court Opinion is found at J.A. 292-311.

[10] The district court also ruled that the bankruptcy court did not err in deeming Sharp's misrepresentations to be immaterial. The district court agreed with the bankruptcy court that such misrepresentations were immaterial because, "[a]lthough a third mortgage would have diminished the value of the collateral and depleted the available sources for repayment, under the circumstances of this case, the relatively small Signet loan was not likely to have influenced the Bank's decision." District Court Opinion 17.

14

attached title abstract. The district court explained that, "[e]ven if the parties had a preexisting depository relationship, the nature of the relationship was not of the sort that could support the Bank's blind reliance on Sharp's assertions." District Court Opinion 12. In so ruling, the district court accepted the bankruptcy court's findings with respect to the credit memorandum prepared by Bank Chairman Fernebok. According to the district court, the Fernebok credit memorandum "supports the finding that the Bank was interested in developing a profitable relationship with First Charter," and the Bank's eagerness "very well could have affected its judgment and thoroughness in reviewing Mr. Sharp's loan file." Id. at 13.[11]

The Bank has filed a timely notice of appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

---

[11] On the proximate cause issue, the district court ruled that the bankruptcy court had not erred in finding that Sharp's misrepresentations were not a proximate cause of the Bank's loss. The district court explained that, in light of the Bank's failure to verify Sharp's title on the Maryland Property, plus the nature of other pertinent lending factors — such as the value of First Charter, Sharp's net worth, and his expected commissions — the bankruptcy court had not erred in finding that the omission of the Signet Loan from the title insurance commitment and abstract was not a proximate cause of the Bank's loss. See District Court Opinion 14-15.

15

Where, as here, a district court acts as a bankruptcy appellate court, "our review of [its] decision is plenary." Bowers v. Atlanta Motor Speedway, Inc. (In re Se. Hotel Props. Ltd.), 99 F.3d 151, 154 (4th Cir. 1996). In such a circumstance, "we review the bankruptcy court's decision independently." Banks v. Sallie Mae Servicing Corp. (In re Banks), 299 F.3d 296, 300 (4th Cir. 2002). Thus, we review for clear error the findings of fact made by the bankruptcy court, and we assess de novo its conclusions of law. See Deutchman v. IRS (In re Deutchman), 192 F.3d 457, 459 (4th Cir. 1999). In analyzing whether a bankruptcy debtor is entitled to relief under a statutory exception from discharge, "we traditionally interpret the exceptions narrowly to protect the purpose of providing debtors a fresh start." Foley & Lardner v. Biondo (In re Biondo), 180 F.3d 126, 130 (4th Cir. 1999).

III.

We are satisfied to dispose of this appeal by addressing only the Bank's reliance contentions and the bankruptcy court's rulings thereon. Although Sharp's behavior was entirely reprehensible, such behavior does not — in the absence of sufficient proof of the reliance elements — render his debt obligations on the Loan nondischargeable under either subsection (2)(A) or (2)(B). The two reliance issues presented by

16

subsections (2)(A) and (2)(B) implicate separate levels (or degrees) of reliance. Subsection (2)(A) required the Bank to show "justifiable reliance," which implicates a "less demanding" standard of proof than the "reasonable reliance" mandated by subsection (2)(B). Field v. Mans, 516 U.S. 59, 61, 66 (1995). Regardless of the requisite degree of reliance, however, both of the reliance elements are factual issues, and the bankruptcy court's findings of fact may not be set aside on appeal unless they are clearly erroneous. See Lentz v. Spadoni (In re Spadoni), 316 F.3d 56, 58 (1st Cir. 2003) (justifiable reliance); Apte v. Japra (In re Apte), 96 F.3d 1319, 1324 (9th Cir. 1996) (justifiable reliance); Citizens Bank of Md. v. Broyles (In re Broyles), 55 F.3d 980, 983 (4th Cir. 1995) (reasonable reliance); Guske v. Guske (In re Guske), 243 B.R. 359, 362 (8th Cir. 2000) (justifiable reliance). As explained below, the bankruptcy court did not clearly err in finding that the Bank's reliance on Sharp's misrepresentations was neither justified nor reasonable.

A.

With the clear error standard of review in mind, we turn first to the bankruptcy court's finding — made with respect to subsection (2)(A) — that the Bank was not justified in relying on Sharp's misrepresentations in the title insurance commitment and attached title abstract that was submitted in support of the

17

Loan application.[12]  To satisfy the justifiable reliance element, a creditor must first prove that it <u>actually</u> relied on the debtor's misrepresentations.  See <u>Field</u>, 516 U.S. at 68.  After establishing actual reliance, the creditor is obliged to demonstrate that such reliance was justified.  Justifiable reliance implicates a subjective standard and "is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." <u>Id.</u> at 71 (citing Restatement (Second) of Torts § 545A cmt. b (1976)).

The justifiable reliance element of subsection (2)(A) does not normally give rise to a duty to investigate.  Indeed, the Supreme Court has explained that a creditor "is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'"  <u>Field</u>, 516 U.S. at 70 (quoting Restatement

---

[12] As explained <u>supra</u>, the bankruptcy court found in <u>Sharp II</u> that the Bank's reliance on the title insurance commitment and attached title abstract was not justified "[g]iven the lack of history between these parties, the irregularity of these documents and the sophistication of the plaintiff."  <u>Sharp II</u> 10.  "Instead of being prudent," the court explained, "the Bank appears to have been more focused on possible future returns and seemingly ignored the fact that, by the time the Loan closed, the financial disclosure was nine months old and the title report was eight months old."  <u>Id.</u>

18

(Second) of Torts § 540 (1976)); see also Foley & Lardner v. Biondo (In re Biondo), 180 F.3d 126, 135 (4th Cir. 1999) (characterizing justifiable reliance as a "minimal standard"). Nevertheless, such "[j]ustifiability is not without some limits." Field, 516 U.S. at 71. Notably, a creditor is not entitled to "'blindly rel[y] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" Id. (quoting Restatement (Second) of Torts § 541 cmt. a (1976)).

As the Supreme Court has explained, a duty to investigate can arise when the surrounding circumstances give rise to red flags that merit further investigation. See Field, 516 U.S. at 72. This analysis turns on "'an individual standard of the [creditor's] own capacity and the knowledge which he has.'" Id. (quoting W. Page Keeton et al., Prosser & Keeton on Torts § 108 (5th ed. 1984)). Thus, when the circumstances are such that they should warn a creditor that he is being deceived, he cannot justifiably rely on the fraudulent statements without further investigation.

Under the trial evidence, the bankruptcy court's finding that the Bank did not justifiably rely on Sharp's misrepresentations in the title insurance commitment and attached title abstract was not clearly erroneous. As the court recognized, several red flags placed the Bank on notice "that

19

something was amiss" and that it should investigate further. Sharp II 10. First and foremost, Sharp's company, First Charter, provided the Bank with the title insurance commitment, to which it attached the stale title report. And, although Sharp also provided his financial disclosure statement to the Bank, the bankruptcy court specifically found that it was also stale — dated eight months prior to the Loan closing in September 1995. Indeed, the financial disclosure statement was characterized by the bankruptcy court as "irregular[]," in that it consisted of two pages on a Bank of Maryland form, rather than on a Colombo Bank form. Id.; see also Sharp I 5. Importantly, the bankruptcy court also found that the Bank — a sophisticated entity — had no previous relationship of trust or confidence with Sharp upon which it could rely. Finally, as Chairman Fernebok's credit memorandum strikingly revealed, the Bank was "hot" to make the Loan and focused on the possibility of future business from Sharp and First Charter, which Fernebok believed the Loan would create. See Sharp II 10. In these circumstances, the bankruptcy court was entitled to find — as it did — that the Bank should have investigated further. As a result, the bankruptcy court's finding of justifiable reliance with respect to subsection (2)(A) was not clearly erroneous.[13]

---

[13] Sharp also contends on appeal that subsection (2)(A) is
(Continued)

20

B.

We turn finally to the reasonable reliance issue, an essential element of subsection (2)(B) that "must be met for a discharge to be denied." In re Broyles, 55 F.3d at 983 (internal quotation marks omitted). In Sharp I, the bankruptcy court found against the Bank on the reasonable reliance issue, ruling that the Bank's reliance on Sharp's misrepresentations in the financial disclosure statement was not reasonable.[14]

As heretofore explained, the reasonable reliance assessment required by subsection (2)(B) imposes a more demanding standard than that applicable to the issue of justifiable reliance. See Field, 516 U.S. at 61, 66. First of all, reasonable reliance — like justifiable reliance — requires actual reliance. See id. at 68 ("Section 523(a)(2)(B) expressly requires not only reasonable reliance but also reliance itself . . . ."). In addition to evaluating actual reliance, a court must objectively

---

inapplicable, because the title insurance commitment and title abstract together constitute a statement respecting his financial condition. Because Sharp's debt obligation is dischargeable in any event, however, we need not reach or address this contention.

[14] As explained supra, the bankruptcy court found that the Bank's reliance on the financial disclosure statement was not reasonable, because "[t]he uncontroverted testimony was that the Bank made no independent investigation of the Sharps' title" and "a lender relies on a title report supplied by the borrower at its peril." Sharp I 8.

assess the circumstances to determine whether the creditor exercised "that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances." Ins. Co. of N. Am. v. Cohn (In re Cohn), 54 F.3d 1108, 1117 (3d Cir. 1995) (assessing factors such as creditor's standard practices in evaluating credit-worthiness, industry standards for evaluating credit-worthiness, and circumstances surrounding debtor's credit application); see also In re Morris, 223 F.3d 548, 554 (7th Cir. 2000); Coston v. Bank of Malvern (In re Coston), 991 F.2d 257, 261 (5th Cir. 1993). In reviewing the circumstances surrounding a debtor's loan application, a court should assess whether "red flags" were raised that should have alerted the lender to the possibility of inaccurate representations; whether there were previous business dealings with the debtor that gave rise to a relationship of trust; and whether a minimal investigation by the lender would have revealed the inaccuracies. See In re Cohn, 54 F.3d at 1117.

Put succinctly, on the trial evidence, the bankruptcy court's reasonable reliance finding was not clearly erroneous. First, the circumstances surrounding Sharp's loan application should have "alerted an ordinarily prudent lender to the possibility that the information [reflected thereon was] inaccurate." In re Cohn, 54 F.3d at 1117. Indeed, the red

22

flags that rendered the Bank's reliance unjustified — the stale and irregular documents, the parties' lack of a prior relationship of trust or confidence, the Bank's sophistication, and its eagerness to establish a depository relationship with Sharp — are also relevant to the reasonable reliance inquiry. Second, the Bank failed to perform a title search with respect to the Maryland Property, despite the fact that the "primary purpose of a title report is to <u>verify</u> the borrower's representations as to the state of title." <u>Sharp I</u> 8. Such a title search would have required minimal effort and most assuredly would have revealed the Signet Loan. Viewing these circumstances objectively, we are simply unable to conclude that the bankruptcy court's reasonable reliance ruling was clearly erroneous.[15]

IV.

Pursuant to the foregoing, we are constrained to affirm the judgment under challenge in this appeal.

<u>AFFIRMED</u>

---

[15] Because the Bank failed to prove the reliance elements of subsections (2)(A) and (2)(B), it is unnecessary for us to address the proximate cause element of subsection (2)(A) and the materiality element of subsection (2)(B).

23

HAMILTON, Senior Circuit Judge, concurring specially:

I concur in the judgment and in Parts I, II, and III(b) of the court's opinion. I write separately to state that I would affirm the district court's entry of summary judgment in favor of Peter Sharp (Sharp) with respect to the Bank's § 523(a)(2)(A) claim on a different ground.

I would affirm the judgment below with respect to the Bank's § 523(a)(2)(A) claim on the authority of Blackwell v. Dabney, 702 F.2d 490 (4th Cir. 1983) and Engler v. Van Steinburg, 744 F.2d 1060 (4th Cir. 1984). Under these precedents, Sharp's misrepresentations in his loan application documents and the title abstract as to the encumbered status of the Maryland property constituted statements respecting his financial condition, and thus, plainly fall outside the scope of 11 U.S.C. § 523(a)(2)(A). In relevant part, such statutory section provides that a Chapter 7 debtor cannot discharge a debt obligation obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition." Id. (emphasis added).

In Blackwell, the debtor had guaranteed loans to his corporation, Studio-1, which guarantee obligations the debtor sought to discharge in bankruptcy. Blackwell, 702 F.2d at 491. The creditor testified that she relied on misrepresentations by the debtor that the business "'was growing'" and was a "'top-

24

notch company'" that was "'just blooming'" and other similar statements. Id. at 492. Of relevance in the present appeal, we held the creditor could not invoke § 523(a)(2)(A) to avoid discharge, because all of the debtor's oral misrepresentations "were essentially statements concerning the financial condition of Studio-1," and therefore, fell outside the scope of § 523(a)(2)(A). Blackwell, 702 F.2d at 492.

In Engler, the debtor, during loan negotiations with the creditor, had falsely stated that the property he offered as security for the loan was completely unencumbered. Engler, 744 F.2d at 1060. We held that the creditor could not prevail upon his § 523(a)(2)(A) claim, because the debtor's false statement that he owned the property free and clear of other liens "is a statement respecting his financial condition," and therefore, fell outside the scope of § 523(a)(2)(A). Engler, 744 F.2d at 1061. Notably, in Engler, we specifically rejected the concept that "a statement respecting the debtor's financial condition means a formal financial statement, such as a typical balance sheet or a profit and loss statement, and not a statement that specific collateral is owned free of other encumbrances." Id. at 1060. In so rejecting, we reasoned as follows:

> Concededly, a statement that one's assets are not encumbered is not a formal financial statement in the ordinary usage of that phrase. But Congress did not speak in terms of financial statements. Instead, it referred to a much broader class of statements--those

25

> "respecting the debtor's . . . financial condition."
> A debtor's assertion that he owns certain property
> free and clear of other liens is a statement
> respecting his financial condition. Indeed, whether
> his assets are encumbered may be the most significant
> information about his financial condition.

Id. at 1060-61.

Under Blackwell and Engler, Sharp's misrepresentations in his loan application documents and the title abstract as to the encumbered status of the Maryland property constituted statements respecting his financial condition, and thus, plainly fall outside the scope of § 523(a)(2)(A). On this basis alone, I would affirm the district court's affirmance of the bankruptcy court's entry of judgment in favor of Sharp with respect to the Bank's § 523(a)(2)(A) claim.

The Bank contends that the Supreme Court's decision in Field v. Mans, 516 U.S. 59, 71 (1995) overruled Blackwell and Engler by holding the phrase "a statement respecting the debtor's or an insider's financial condition," as found in § 523(a)(2)(A), pertained only to classic financial statements. The Bank's contention is without merit.

The Supreme Court granted certiorari in Field solely "to resolve a conflict among the Circuits over the level of reliance that § 523(a)(2)(A) requires a creditor to demonstrate." Field, 516 U.S. at 63. Ultimately, the Court held "that § 523(a)(2)(A) requires justifiable, but not reasonable, reliance." Field, 516

26

U.S. at 74-75. While some reasoning by the Court in _Field_ to explain this holding can arguably be extrapolated to support the narrow interpretation of the financial condition phrase the Bank espouses, such a situation falls far short of constituting Supreme Court precedent upon which we can solely rely to hold that _Blackwell_ and _Engler_ are no longer good law. Until the Supreme Court or an _en banc_ panel of this court overrules the holdings of _Blackwell_ and _Engler_, they remain good law, and I would rely upon them to resolve the Bank's § 523(a)(2)(A) claim presently before us. See _McMellon v. United States_, 387 F.3d 329, 334 (4th Cir. 2004) (_en banc_) (concluding "that when there is an irreconcilable conflict between opinions issued by three-judge panels of this court, the first case to decide the issue is the one that must be followed, unless and until it is overruled by this court sitting _en banc_ or by the Supreme Court").

27